# Richmond

PRINCESS ANNE UTILITIES CORPORATION v. COMMONWEALTH OF VIR-
GINIA, EX REL., ETC., ET AL.

March 8, 1971.

Record No. 7372.

Present, Snead,·C.J., Carrico, Gordon, Harrison, Cochran and Harman, JJ.

*Joseph J. Lawler (Kellam, Pickrell, Lawler, Hodges & Kellam,* on brief), for appellant.

*John W. Riely (Harry T. Marshall, City Attorney for the City of Virginia Beach; J. Dale Bimson, City Attorney Designate for the City of Virginia Beach; Harry Frazier, III; Guy K. Tower; Hunton, Williams, Gay, Powell & Gibson,* on brief), for appellees.

CARRICO, J., delivered the opinion of the court.

Princess Anne Utilities Corporation (hereafter, the utility company) filed with the State Corporation Commission a petition for an increase in rates for sewerage services. The Commission ruled that the requested rates were "excessive, unreasonable and unjust." The utility company's petition was denied, and new rates were fixed by the Commission lower than those previously in effect. The utility company is here on an appeal of right.

The utility company contends that the rates fixed by the Commission are unreasonable and confiscatory. Specifically, the utility company maintains that the Commission erred in excluding from determination of rate base those facilities which were contributed to the utility company in aid of construction and in excluding from annual operating expenses a depreciation allowance on such contributed property.

For the most part the facts are not in dispute. The utility company was granted a certificate of convenience and necessity by the Commission in 1959 to furnish sewerage services to a limited area now located in the City of Virginia Beach. The utility company is a public service corporation privately owned and operated by John Aragona, Sr. Aragona also owns all the stock in several land development companies which, together with the utility company, are in a "brother-sister" corporate relationship. This arrangement was designed by Aragona to permit him to subdivide and develop various tracts of land and then to sell the property with sewerage service to be furnished by the utility company.

In its first year of operation, the utility company collected, transported, and treated sewage from approximately 400 customers. This number soon increased, however, and in 1962 the plant facilities were enlarged to meet the community's needs.

In the same year, the utility company entered into an agreement with the Hampton Roads Sanitation District Commission providing for the District's assumption of the sewage treatment services then provided by the utility company. It was contemplated that this "take over" would occur at the earliest practicable date and not more than three or four years hence. However, the Sanitation District's facilities did not become available for this purpose until July 1969, and the connection was then made. Thereafter, the utility company's service was limited to collecting sewage and delivering it to the facilities of the Sanitation District for treatment. The Sanitation District bills the utility company's customers separately for the treatment service.

Notwithstanding the decrease in the service which it was rendering, the utility company deemed it necessary to increase its base residential rate from $12.00 per quarter to $28.50 per quarter. Rates for commercial customers likewise were to be increased by a fixed amount bearing a fair relationship to the base residential rate.

Accordingly, the utility company petitioned the Commission for approval of the proposed rate modification. The City of Virginia Beach intervened in opposition to the increase, and a hearing was held before the Commission. It was the position of the utility company that the rate increase was necessary in order to yield a "fair return based on (a) the value of the company's property used and useful in its operation; (b) its annual operating expenses and (c) its reasonable operating capital required." The City contested the utility company's right to a return on property in which it had no investment, i.e., the facilities contributed in aid of construction.

On this point, the evidence shows that it was the practice of the development companies controlled by Aragona to sell land to one another, or through one another to unrelated builders, and to reduce the purchase price by an amount equal to the cost of constructing sewerage facilities thereon. The developers would install the sewerage facilities and then transfer them, without charge, to the utility company. In some instances, "tap-in fees were paid [to the utility company] by unrelated builders for which a like reduction was made in the purchase price of land from the related companies." In other cases, tap-in fees were paid directly by customers. All these items were listed by the utility company on financial statements received in evidence by the Commission as "Contributions in Aid of Construction."

The utility company's principal accounting witness, Gerald D. Sherman, testified before the Commission that the net cost of the company's plant which should be used in determining base for rate fixing was $2,920,896.17. Sherman further testified that in the financial statements he had compiled, a total of $3,233,840.39 was shown as "Contributions in Aid of Construction." The witness insisted that although the amount of contributions exceeded investment in plant by more than $300,000, the contributions should not be excluded in determining base for rate-fixing purposes.

The Commission's chief accountant, James H. Brown, testified that his staff had made a careful examination of the utility company's records and had found that the figures shown on Sherman's financial statements were not recorded on the books of the company. Brown

further stated that his examination of the company's records showed that the net cost of plant was $73,860.46, a figure reflecting the deduction of contributions in aid of construction. Brown said that in preparing his figures for revenue requirements of the utility company, his computations were made on the assumption that the company had no rate base.

The Commission held that since "practically the entire plant" of the utility company "was built by contributions in aid of construction," the company had "a near-zero rate base" and was not entitled to "earn a return" upon such contributions. The rate to be fixed, therefore, ruled the Commission, "must be sufficient to pay only the expenses of operating the system." The Commission fixed the residential rate at $8.00 per quarter and the apartment and commercial rates at figures appropriately modified with relationship to the residential rate.

This brings us to the principal question raised on this appeal: Did the Commission properly exclude contributions in aid of construction in determining the utility company's base for rate-fixing purposes?

The question is one of first impression for this court. The utility company urges us to adopt a rule requiring inclusion in rate base of all contributions in aid of construction, no matter how or from whom acquired. It contends that it "owns these facilities" and "it makes no difference from where the facilities or the money to construct them came." Having devoted the facilities "to serving the public," the utility company argues, it "is entitled to be paid at a fair rate for the use of its property."

We do not agree. In excluding contributions in aid of construction from rate base, the Commission followed, and we think properly so, what is the near-universal rule in public utility rate cases. As Professor Priest says in his work "Principles of Public Utility Regulation," Vol. 1, ch. 4, p. 177, "court and commission decisions holding that contributions in aid of utility construction must be excluded from rate base have been so uniform as probably not to require detailed citation."

But aside from the fact that the just-cited rule is the one generally followed, there is another consideration prompting its adoption. The rule is based on principles of fairness. It is inequitable to require utility customers to pay a return on property for which they, and not the utility, have paid. *City of Hagerstown* v. *Public Service Commission*, 217 Md. 101, 112, 141 A.2d 699, 704 (1958).

The utility company argues, however, that the general rule is inapplicable to its case because most of the contributions to its plant were made not by customers but by land development companies, with some of the latter in a "brother-sister" corporate relationship with it and controlled by the "same economic entity." In this connection, the utility company asserts that there was no evidence to support the Commission's finding, set forth in its opinion, that the land development companies, having paid for the construction of the utility plant, "got their money back from the purchasers of lots."

It makes no difference, however, in the view we take of the case, whether the contributions to the utility company were made initially by the customers or by the land development companies or whether some of the latter were closely related to the utility company. The controlling factor is whether the utility company's customers ultimately bore the cost of such contributions.

It is true that there was no actual testimony before the Commission relating to what items made up the prices of the homes purchased by those who became customers of the utility company. But it would be wholly unrealistic to say that the costs of the sewerage facilities contributed by the land development companies were not passed on to those customers. As the Commission pointed out in its opinion, it is common practice in real estate development to finance construction of sewerage facilities by the contribution method employed in this case, with the cost of such construction reflected in the prices paid by the purchasers of homes in the finished development. That the same result occurred in this case there can be no doubt. Neither the Commission nor this court needs testimony to tell it what is a matter of common knowledge.

Thus, to allow the utility company a return on contributions in aid of construction would have the effect of requiring the customers to pay twice for the same property. This would be unjust. Such contributions were, therefore, properly excluded by the Commission in determining rate base.

The question whether the Commission properly excluded a depreciation allowance on the contributed property is more difficult. This is so because there is a sharp split of authority on the subject, and valid arguments can be advanced to support either view.

We have examined numerous utility rate cases and have concluded that where depreciation is allowed, the rationale is that since the utility owns and must ultimately replace the property, it should be entitled to a reasonable depreciation allowance as part of its annual

operating expenses to build up a reserve against the day when replacement must occur. *See, e.g., Re Central Light & Power Company*, 37 P.U.R. (n.s.) 106, 114 (N.D. Pub. Serv. Comm'n. 1940). This view, it appears to us, would be appropriately applicable in those jurisdictions which follow the "fair value" rule, rather than the "original cost" rule, of measuring rate base in utility cases.

Where depreciation is not allowed on contributed property, the rationale is that depreciation is designed to permit the utility to recoup its investment in plant, and where there is no investment because the property has been contributed, there is nothing to be recovered. *See, e.g., Re Cokeville Radio & Electric Co.*, 6 P.U.R. 3d 129, 139 (Wyo. Pub. Serv. Comm'n. 1954). This concept, we think, is logically applicable in those jurisdictions which, like Virginia, follow the "original cost" rule in determining rate base.

Here, the Commission chose between the two views, adopted the latter, and disallowed depreciation. In so doing, the Commission exercised the legislative discretion vested in it by the General Assembly. Code § 56-235. Respectable authority and sound logic support the view adopted by the Commission. It cannot be said, therefore, that it abused its discretion. *Holding Corp.* v. *Utilities Corp.*, 207 Va. 729, 734, 152 S.E.2d 50, 54 (1967).

The order appealed from will be affirmed.

*Affirmed.*