[L.A. No. 32091. Dec. 31, 1986.]

MAGDALINE M. HANSEN et al., Plaintiffs and Appellants, v. CITY OF SAN BUENAVENTURA, Defendant and Respondent.

1174

**COUNSEL**

Stone & Stone, Helene Stone and Richard C. Gilman for Plaintiffs and Appellants.

Donald S. Greenberg, City Attorney, Michael R. Dougherty, Assistant City Attorney, Arthur L. Littleworth, Best, Best & Krieger and Ariel P. Calonne for Defendant and Respondent.

Jerome B. Falk, Jr., Steven L. Mayer and Howard, Rice, Nemerovski, Canady, Robertson & Falk as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**GRODIN, J.**—Defendant City of San Buenaventura (hereafter referred to as Ventura) owns and operates a water company which serves customers who reside both in and outside the city boundaries. In 1972, Ventura enacted an ordinance imposing a 70 percent surcharge on water supplied to customers living outside the city limits. Those nonresident customers brought this class action to challenge the surcharge, seeking declaratory relief and damages on the ground that the rates imposed were unreasonable, arbitrary, and discriminatory and that the rate structure denied them equal protection. Following a nine-day trial, the superior court held the 70 percent surcharge was reasonable and entered judgment for Ventura. The Court of Appeal reversed and remanded for a new trial; Ventura sought review in this court.

We granted review to resolve the important question of whether a municipal utility may recover a reasonable rate of return on its investments and to clarify what circumstances may be considered by a court in determining whether a rate is reasonable. We conclude that a municipal utility is entitled to a reasonable rate of return and, for reasons we shall explain, we agree with the trial court that the 70 percent surcharge on water supplied nonresidents in this case was justified. Accordingly, we reverse the judgment of the Court of Appeal.

I

The City of Ventura has owned and operated its own municipal water system since 1923 when it bought the facilities of the public utility corporation that had previously supplied water to the city and surrounding areas. Ventura financed the sale through a $250,000 general obligation bond issue. Between 1925 and 1960, the citizens of Ventura authorized four additional general bond issues to improve and modernize the system. Totalling over $3.6 million, these bond issues subjected all private property in the city to a lien: if funds were unavailable to pay the bonds, the bond-

holders had the right to require Ventura to levy taxes on all private property to meet the bond indebtedness.

Throughout the years, the citizens of Ventura demonstrated their commitment to the system by allowing the city to use its general fund monies to help maintain and improve the system. Ventura used its general fund monies 1) to provide office space for water system employees as well as for city employees who rendered services for the water system and 2) to pay a portion of the salaries of city employees who performed accounting, billing, administrative, and legal services for the water system. Additionally, Ventura made a number of transfers from its general fund to the water system at little or no interest.

Ventura also used power taxes in the amount of nearly $300,000 to support the water system in the 1971-1972 and 1976-1977 fiscal years. These funds represented transfers to the system from tax payments made by residents only. Additionally, Ventura required new in-city customers to pay upfront connection and acreage fees to obtain water service. These contributions, which were used to benefit the entire water system, totalled over $600,000 from 1964 until trial, in 1978. No water system revenues have ever gone to Ventura's general fund; all water revenues, acreage and connection fees, power tax revenues, and contributions from the city's general fund have been used to operate and maintain Ventura's water system.

In 1966, Ventura purchased the Mound Water Company (Mound), a small mutual water company[1] serving customers outside the city. At the time of the sale, Mound represented to Ventura that the Mound shareholders, that is the Mound customers, had approved the transaction. Thus, the sale was truly consensual in that the very customers who were to receive water from Ventura ratified the purchase.

Pursuant to the terms of the purchase agreement, Ventura agreed to furnish water "to those customers heretofore served by Mound who may desire such service at the regularly established rates for water service from the Ventura Water System." However, nothing in the sale agreement precluded Ventura from continuing to apply reasonable rate differentials between residents and nonresidents as it had done for years.[2] The purchase agreement

---

[1]Public Utilities Code section 2725 defines a mutual water company as "any private corporation or association organized for the purposes of delivering water to its stockholders and members at cost, including use of works for conserving, treating and reclaiming water."

[2]Ventura has maintained a differential in water rate schedules for over 50 years, with out-of-city customers required to pay higher rates than in-city customers. Between 1935-1952 the average surcharge was 48 percent, while between 1953 and 1972 that figure dropped to 32 percent. Pursuant to the ordinance enacted in July 1972 and continuing until the present, the surcharge imposed on out-of-city customers has been 70 percent.

only assured that Ventura would continue to provide service at regularly established rates to customers served by Mound at the time of the sale.

The water that Mound had supplied its users prior to the sale came from wells of poor quality which were below public health standards. On acquisition, Ventura abandoned the polluted wells and commenced supplying the former Mound customers with water of substantially better quality. It is undisputed that the sale of Mound to Ventura immediately and significantly improved the quality, availability, and overall source of supply and service to the customers previously served by Mound, customers who all live outside the city boundaries and are presently subject to the disputed surcharge.

In 1969, Ventura acquired a second water company, the Saticoy Water Company (Saticoy). Saticoy was an investor-owned public utility, 60 percent of whose customers were residents of Ventura, 40 percent nonresidents. Because of the nature of the ownership of the utility, the Saticoy customers were not given an opportunity to approve the sale. However, they were given the chance to participate in an election to approve or disapprove the purchase of Saticoy by Ventura. Close to 90 percent of those customers who voted registered approval. In addition, customers also had the opportunity to appear before the Public Utilities Commission (hereafter referred to as P.U.C.), but it appears no protests were in fact received.

Under the terms of the agreement, Ventura was bound for 60 days to maintain the rates charged by Saticoy prior to the sale; however, following the 60-day period, Ventura had the right to alter the preexisting rates. The sale contract further provided: "[Ventura] agrees that from and after the closing date it will serve water without unfair or unreasonable discrimination to all customers in the area wherein [it] is certified to provide service by the California Public Utilities Commission whether such customers are located within or without the territorial boundaries of the city and will continue to serve all of such customers." Nothing in the sale agreement, however, specifically precluded Ventura from applying reasonable rate differentials between residents and nonresidents.

Saticoy customers benefited immediately and substantially from the sale. Instead of continuing to rely on four small storage tanks, they suddenly had available over fifty million gallons of storage capacity from a vast network of tanks and reservoirs tied into Ventura's system. Further, the two wells formerly owned by Saticoy fell short of state health standards with respect to water quality. Ventura abandoned one well immediately and placed the other on standby status, to be used only in event of emergency.

The improvements to both the former Mound and Saticoy customers were not without cost. By 1969, Ventura was serving approximately 2,800 out-

of-city water users, the vast majority of whom were added in conjunction with the Mound and Saticoy acquisitions. Because Ventura did not have sufficient surplus water of its own and because it did not acquire any surplus water as a result of these acquisitions, Ventura was obliged to purchase additional water. The cost of the additional water purchased from the Casitas Municipal Water District (Casitas) and others was substantially greater than the cost of Ventura-owned water sources.[3] In addition to purchasing additional water to accommodate the needs of its additional customers, Ventura was forced to expand and improve its facilities. Partly because the facilities purchased from Mound and Saticoy were inadequate to meet the needs of customers previously served by these two water companies, Ventura undertook major improvements to improve and expand its own facilities.[4]

In 1970, Ventura acquired by assignment a contract for 10,000 acre feet of water annually from the State Water Project. Under the contract, Ventura obliged itself to make payments for the next 65 years estimated at $58 million. Although Ventura had yet to receive any state water at the time of trial, it had made the required annual payments for capital and fixed operating and maintenance costs. Not only must Ventura make payments irrespective of whether it receives water, but the contract provides that it must levy taxes if revenues should be insufficient to meet these payments. This tax lien obviously falls only on property owners in Ventura; as a class, nonresident water users do not share the risk of this obligation. Another burden not shared by out-of-city users was Ventura's obligation to construct the necessary transmission facilities to bring water from the state system, an estimated cost at time of trial exceeding $50 million.

Because of the impact caused by the acquisition of the two water companies, in 1970 Ventura retained the consulting firm of Wilsey & Ham to analyze the water rates. The firm initially recommended and Ventura adopted a 20 percent overall rate increase. At some later point, after obtaining updated figures and doing further careful and lengthy analysis, the firm recom-

---

[3]Water purchased in 1970 by Ventura from Casitas cost $44 an acre foot and from Alta Mutual $35 an acre foot. At the time of the 1978 trial date, these prices had jumped to $61 and $56 respectively, vis-à-vis, the $20-$25 price of well water for Ventura. The cost of Ventura river water, obtained by Ventura from its Foster Park facility, is minimal. By virtue of having its own water sources, Ventura saves approximately $30-$40 per acre foot of water that it does not have to purchase. As the cost of alternative sources of water has increased, the water rights of Ventura have become more valuable. These water rights were conservatively set at $5 million in 1978.

[4]Some of the major improvements made during the 1970's to the Ventura Water System which benefited plaintiffs include the construction of 6.5 million gallons of additional storage, an 8-mile transmission main, and a pump station. In part, these and other improvements were financed by revenue bond issues totalling $6.5 million.

mended: 1) another 10 percent overall rate increase and 2) the imposition of the 70 percent surcharge on outside customers. It also recommended a rate scheme recognizing three separate classes of customers: 1) residents using treated, potable water; 2) nonresidents using treated, potable water; and 3) industrial users of untreated, nonpotable water. All industrial users of untreated water also happened to be nonresidents. Ventura subsequently enacted an ordinance adopting these recommendations. That ordinance, along with subsequent ordinances enacted in 1975 and 1977, constitute the subject of this litigation.

After the action below was filed but before trial, Ventura engaged a second consulting firm to examine its rate structure.[5] That firm, Brown & Caldwell, concluded that the rates were more than reasonable and, in fact, an even greater differential could have been justified.

The trial court concluded the rate structure was reasonable. The Court of Appeal reversed and remanded for a new trial, holding that as a matter of law a municipality is not entitled to a return on investment and that Ventura erred in calculating the amount of surcharge to nonresidents.

## II

■ A city which acquires the water system of another community incurs an obligation to deal fairly with its customers in that community and to provide them with service at reasonable rates. (*County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154, 159 [161 Cal.Rptr. 172, 604 P.2d 566].) Rates established by the lawful rate-fixing body are presumed reasonable, fair and lawful. (*Elliott* v. *City of Pacific Grove* (1975) 54 Cal.App.3d 53, 59 [126 Cal.Rptr. 371]; *Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133, 139 [102 P.2d 759].) Thus, plaintiffs bear the burden of showing that the rates fixed are unreasonable or unfair. (*Elliott, supra,* 54 Cal.App.3d at p. 60.)

■ A showing that rates lack uniformity is by itself insufficient to establish that they are unreasonable and hence unlawful. To be objectionable, discrimination must "draw an unfair line or strike an unfair balance between those in like circumstances having equal rights and privileges. . . . 'It is only unjust or unreasonable discrimination which renders a rate or charge

---

[5]At trial, plaintiffs' attorney suggested that the study begun by Brown & Caldwell in 1976 was irrelevant because the 70 percent surcharge was originally imposed in 1972. The lower court overruled the objection, agreeing with Ventura that if the study could provide a reasonable basis for the rates, there could be no complaint with the city council's action in enacting the ordinance. In other words, even if Ventura arrived at reasonable rates based on the wrong reasons, the rates would nonetheless be lawful.

unreasonable. . . .'" (*Durant, supra,* 39 Cal.App.2d at pp. 138-139.) Unreasonableness will be shown where the discrimination rests solely on the nonresident status of the user. (*Inyo, supra,* 26 Cal.3d at p. 159, fn. 4.)

 Reasonableness, then, is the beginning and end of the judicial inquiry.[6] Clearly, the fact that nonresident users of public utility service are subject to a higher rate than those customers residing within city limits does not alone prove the rate unreasonable and hence invalid. Rather, nonresidents must show that the discrimination is not based on "cost of service *or some other reasonable basis.*" (*Inyo, supra,* 26 Cal.3d at p. 159, fn. 4, italics added; see *Durant, supra,* 39 Cal.App.2d at p. 139.)

To determine whether the rates Ventura imposed on nonresident customers were reasonable, Brown & Caldwell compared revenue requirements (expenses, costs) properly allocable to nonresident customers with the actual revenues received from that group. To ascertain the first element, it conducted a cost-of-service analysis.

According to evidence, the cost-of-service analysis calculates the share each customer should pay for utility service proportional to actual use of the system. Revenue requirements are allocated to various classes based on each group's proportionate use of the system, including use of physical plant facilities and consumption of water, among other elements. A preliminary step in determining revenue requirements is the establishment of appropriate classes among which costs will be allocated. The next step is to calculate the costs which properly should be assessed each group. For this analysis, two alternative methods exist: the cash basis and the utility basis. Very generally, the cash method sets revenue requirements based on actual operating and maintenance expenses plus allowable charges for system replacement, debt principal repayment, and other capital costs. The utility method also considers actual operating and maintenance expenses, but instead of looking to cash expenses such as system replacement and debt principal repayment, the method focuses on depreciation attributable to outside use and on rate of return on investment.

The utility method is commonly used to establish revenue requirements where a class of customers owned the utility and another class uses the facilities owned by the others. It is nationally recommended by the American

---

[6]As the court stated in *Kennedy* v. *City of Ukiah* (1977) 69 Cal.App.3d 545 [138 Cal.Rptr. 207]: "Municipal corporations have the authority and power to establish and operate works for supplying their inhabitants with water. They also have the power to fix the rates to be charged for the sale of the water. [Citations.] The only requirement is that such rates be reasonable. [Citations.]" (*Id.,* at p. 552.)

Water Works Association for determining water rates of municipal customers located outside a city. Brown & Caldwell used the utility method to determine revenue requirements. Significantly, the rate of return it employed was much lower than that granted a number of companies regulated by the California P.U.C. Based on its analysis, it found a surcharge of 98.5 percent was justified. Nonetheless, Ventura continued to impose the 70 percent surcharge it had established in 1972.

As noted, the utility method focuses on depreciation and rate of return on investment.[7] Depreciation is typically defined as a recovery of cost over the life of the facility as it is used; it does not provide for the replacement of the facility.[8] Partly for this reason, a rate of return is allowed.

In the context of the utility method, return on investment allows a municipal utility to raise necessary replacement funds and to pay debt on the system. It also allows the municipality to be compensated for having invested its money and incurred the risks associated with building and maintaining a water system. Moreover, it compensates the municipal utility for foregoing the opportunity to use its money in some other manner. ■ Rate of return is, in essence, payment for the use of property of another.

■ Municipal utilities have historically incorporated a return on investment on rates charged customers.[9] Certainly, the existence of a practice is not dispositive of its legitimacy, but while no case squarely establishes the proposition that municipal utilities may recover a return on investment through rates charged to nonresidents, case law does suggest such a practice is permissible. Moreover, common sense and basic economic principles dictate the necessity of such a rule.

California cases indicate that utility rates need not be based purely on costs. In *Golden Gate Bridge etc. Dist.* v. *Luehring* (1970) 4 Cal.App.3d

---

[7]In its opening brief, Ventura argued that a rate of return or return on investment is not a profit. However, in its subsequent answer to plaintiffs' opening brief, Ventura apparently retracted this argument and acknowledged that "[s]ome cases have referred to [return on investment], acceptably, as 'profit.'" In any event, the trial court found on rehearing that a return on investment is a profit: "We are not impressed by counsel's attempt to distinguish between a rate of return and a profit. The terms are synonymous. [Citations.]"

[8]The project manager of Brown & Caldwell testified that the consultants considered depreciation on an original cost basis, as is proper, rather than on the projected replacement cost of new facilities.

[9]According to the August 1911 issue of Pacific Municipalities, the official monthly publication of the League of California Municipalities, the return on Pasadena's municipal light and power plant was between 9 and 11 percent on total investment; Sacramento's water system yielded an annual net return of approximately $100,000; and Los Angeles derived sufficient revenue in its first nine years of operation to rebuild the inadequate system it had acquired, to address the demands of growth, to meet the interest and sinking fund requirements of the water bonds, and still "to leave the city a profit" of about $125,000.

204 [84 Cal.Rptr. 291], the court stated that "the [California] Constitution does not inhibit an entity of local government from collecting fees for services it performs and using the *net proceeds* of enterprises such as municipal utility systems for the benefit of its own general fund." (*Id.*, at p. 215, italics added.) In *Beard* v. *City & County of San Francisco* (1947) 79 Cal.App.2d 753 [180 P.2d 744], the Court of Appeal noted "parks, playgrounds, public utilities, and other facilities in aid of the health and welfare of the community . . . . *may be operated for profit.*" (*Id.*, at p. 755, italics added.) Finally, according to *Dyke Water Co.* (1963) 61 Cal. P.U.C. 315, "it is for the local governing body to determine precise rates and whether the system should be subsidized or *profitable.*" (*Id.*, at p. 321, italics added.) Plaintiffs' contention that Ventura must provide service to nonresident customers at "cost" without an opportunity to recover a reasonable rate of return is incorrect.

Plaintiffs urge that a rule requiring municipal utilities to provide service to nonresident customers at cost is necessary to protect the interest of out-of-city users. Whereas consumers of services provided by private utilities are protected by the P.U.C., plaintiffs would have us believe nonresident users of municipal utilities are left to the mercy of the municipality. ■ Although judicial review of rates is not comparable to regulation by the P.U.C., it does "protect consumers against plainly unfair rates . . . ." (*Inyo, supra*, 26 Cal.3d at pp. 159-160.) Significantly, the present case appears to be only the second municipal utility rate case in California history. The paucity of such litigation suggests that existing law functions sufficiently. However, even if existing law is inappropriate or inadequate, it would seem to be the Legislature's role to revise it. Despite our statement that there is no constitutional barrier to bringing municipal utilities within P.U.C. jurisdiction (*Inyo, supra*, 26 Cal.3d at pp. 163-167) the Legislature has to date declined to modify the existing system.

The rule sought by plaintiffs would have a negative impact on the expansion of California municipal utilities. Without the opportunity to obtain revenue necessary for system replacement and expansion, there would be little incentive for municipal utilities to expand in order to service nonresident users. Moreover, without a chance to recover a reasonable rate of return, a municipal utility would be foolish to increase its business risk by expanding service to nonresidents without demanding a commensurate increase in return.

### III

■ The trial court in the instant case concluded an 8.67 percent rate of return charged nonresidents was reasonable vis-à-vis the 3.0 percent

return charged residents. We agree. A higher rate of return for nonresidents is justified because (1) the in-city customers (as residents of Ventura) incurred substantial risks and obligations not shared by out-of-city users and (2) in-city sources of revenue both directly and indirectly financed the system in ways that out-of-city revenues did not. More specifically, only property of residents was subject to the general obligation and the State Water Project liens, and only Ventura and its taxpayers bore the responsibility for management of the system, for repairs and replacement in event of disaster, and for construction of the transmission system to bring state water to the city. As for a difference in sources of revenue, residents paid taxes that contributed to the system, while nonresidents did not, and only resident customers had to pay connection fees. Moreover, Ventura's city government provided support and stability for the water system over the years: general monies of Ventura were used to provide office space and to pay salaries of the city employees who performed accounting, billing, administrative, and legal services for the water system; Ventura made a number of transfers from its general fund to the water fund at either little or no interest; and only Ventura and its taxpayers bore the responsibility for (1) management of the system, (2) repairs and replacement, and (3) construction of the transmission system to bring state water to the city.

Plaintiffs contend that any contribution made from Ventura's general fund should be disregarded because it was a source of revenue from the city government and not the city ratepayers. But, the use of city funds cannot be disassociated from its citizens. ▮ When a city uses its funds to support the water system, out-of-city customers can fairly be expected to pay higher rates. (See *Dyke, supra,* 61 Cal. P.U.C. at p. 321.) ▮ Second, evidence showed some of the general fund originated from taxes, and all in-city ratepayers are also taxpayers. Third, the evidence is plain that the citizens themselves bear certain significant risks. Unlike those living outside the city, residents are uniquely responsible for the general obligation bonds that built and improved the system, for the reason that Ventura must levy taxes on private property within the city boundaries if revenue is insufficient to meet that requirement. For the same reason, residents bear the risk of Ventura's long-term contractual commitment with the state to pay an estimated $58 million for water from the State Water Project.[10]

In its 57 pages of findings of fact and conclusions of law, the trial court implicitly found that a difference of rate of return was justified. It also

---

[10]Plaintiffs contend that the issue of property tax liens arising from Ventura's general obligation bonds and its State Water Project contract is an obligation of city property owners, but not on in-city residents. Obviously, many in-city ratepayers are city property owners and hence property taxpayers. As for those in-city ratepayers who do not own their homes, it is reasonable to assume that they will bear some of the burden of an extra property tax in the form of higher rents.

specifically found that the rates charged nonresident customers were fair and reasonable and were commensurate with the cost of service provided for the following reasons: the costs of providing services to nonresidents were greater, in part because Ventura had to purchase more expensive water to supply the former Mound and Saticoy customers; these same nonresident customers used up surplus capacity, which had been previously provided by Ventura, without making any capital contributions; Ventura substantially improved the water service to the former Mound and Saticoy customers and such service fully justified the rates charged; the nonresidents have not made and do not make the same financial contributions to the maintenance of the water system as do residents; only residents are charged acreage and connection fees, which raise funds for the water system; nonresidents do not have the same obligations and responsibilities for the replacement and repair of the system in the event of disaster or to provide for the expansion to meet population growth; Ventura continues to use its general fund and its credit to support its water system; nonresidents, having foregone nothing and shared in no risk in building up the plant, cannot expect to share in the benefits accruing from city ownership; a municipality is entitled to recover the cost of fire protection from nonresidents, standby water demand being greater by the addition of outside areas; and a municipality is entitled to earn a return on its plant and facilities devoted to nonresident users. Contrary to the Court of Appeal, we agree that most of these justifications are appropriate.

### Miscellaneous Benefits

There is no question that after acquisition the former Mound and Saticoy customers immediately received substantial benefits such as improved water quality, increased water storage, upgraded fire protection due to Ventura's pumping stations, and major transmission lines. These improvements used up both reserve and growth capacity in facilities previously provided at the expense of in-city customers.[11] If Ventura had not charged nonresident users a higher rate of return than it charged its own residents, then in-city ratepayers would be subsidizing out-of-city ratepayers for the latter group's proportionate share of these expenses.

Plaintiffs argue that it was improper to pass on the additional cost of purchasing more expensive water directly to nonresidents. They vehemently

---

[11]Plaintiffs argue that residents alone did not pay for the facilities. They argue that all operating expenses, bond obligations, and State Water Project contract payments have always been paid solely from revenues of both resident and nonresident ratepayers. However, plaintiffs fail to realize that the vast majority of nonresident consumers did not spring into being until 1966 and 1969 when Ventura purchased the Mound and Saticoy companies. For some 45 years prior, only a handful of nonresidents had contributed to the acquisition, maintenance, and improvement of the water system.

insist that whatever new water supplies benefited nonresidents who were former Mound and Saticoy customers also benefited residents who were former Saticoy customers. This is true, but plaintiffs fail to mention that the cost allocated to nonresidents covered only the cost required to supply them. Nonresidents were not charged with the cost of supplying new expensive water to resident customers. These additional costs of in-city users were shared by all members of that class.

■ Plaintiffs also make much of the fact that a large portion of nonresident users are technically ineligible to receive Casitas water because they live outside the Casitas water district. This argument seems irrelevant. Irrespective of whether nonresidents actually received molecules of water piped from Casitas or molecules of other water, Ventura had to purchase the more expensive Casitas water to provide service to these new nonresident customers.

■ We conclude it was proper for the trial court to justify a surcharge based on this theory. (See *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 232, fn. 4 [211 Cal.Rptr. 567].)

*Rate Base*

■ ■ Plaintiffs argue that Ventura should have excluded from rate base[12] any facilities donated by developers or financed through connection and acreage fees. Ventura contends that such a conclusion would leave it without depreciation funds sufficient to replace its entire system. According to plaintiffs, however, it would be inequitable to allow Ventura to earn a return on property provided by customers themselves.

■ Contrary to plaintiffs' contention, in this context we see nothing inequitable in including in the rate base assets that have been paid for by past ratepayers. Unlike *Pacific Tel. & Tel.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 663-665 [44 Cal.Rptr. 1, 401 P.2d 353], relied on by the dissent, in this case the inclusion of such assets does not result in a double *payment* by past ratepayers, but rather simply permits the past ratepayers to be, in effect, *credited* for their past contributions to capital. If the municipal utility's proposed profit is to be accurately evaluated pursuant to the "utility method," such assets are properly included in the rate base.

The Court of Appeal also disapproved the inclusion of the increased value of water rights. In fact, Brown & Caldwell did not employ this capitalization

---

[12]Rate base is the value of the property on which the utility is entitled to a return. "The rate base on which a return may be earned is the amount of property used and useful, at the time of the rate inquiry, in rendering a designated utility service." (1 Priest, Principles of Public Utility Regulation (1969) p. 139.)

figure, but used the 1940 book value of $1,215,000. Accordingly, we do not have to decide whether a higher figure would have been appropriate.

The court mistakenly states that Brown & Caldwell viewed the amounts owed under the state contract as an asset instead of a liability. On the contrary, the project manager testified the firm's study treated the item as debt and did not allocate any of the principal amounts due under the contract to nonresident users.

Finally, the court noted that Ventura could not impose an in lieu tax on nonresidents. However, as the court also noted, "[t]here is nothing in the record indicating that the city ever attempted to officially impose such a tax."

*The Three-tier Classification Scheme*

It is well established that "'a utility may, without being guilty of unlawful discrimination, classify its customers or patrons upon any reasonable basis . . . .'" (*Durant, supra,* 39 Cal.App.2d at p. 139; see *Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 543-544 [149 Cal.Rptr. 692, 585 P.2d 491]; *Kennedy* v. *City of Ukiah* (1977) 69 Cal.App.3d 545, 553-554 [138 Cal.Rptr. 207].) The trial court found Ventura's three-tier classification scheme to be fair and reasonable. Plaintiffs, however, objected to Ventura's three-tier classification scheme based on what it perceived to be a feigned distinction in treating users of nonpotable, untreated water as a separate class.

Plaintiffs make much of the fact that the first consulting firm Ventura hired initially recommended a surcharge of 38.8 percent based on a two-tier classification: out-of-city water users (both industrial and domestic) and in-city users. Later, after reanalyzing and updating the data, the firm concluded a three-tier classification scheme was more appropriate and subsequently found a 70 percent surcharge more accurate. It is difficult to imagine a more natural or obvious classification. The cost of supplying treated water is indisputably very different than the cost of untreated water. The classification seems patently reasonable.

IV

Plaintiffs argue that as a matter of law the 70 percent surcharge violates Government Code section 54514, which requires the local agency to provide water "at the lowest possible cost consistent with sound economy, and prudent management, and the security and payment of the principal and interest of the bonds." (Gov. Code, § 54514.) Although section

54514 does require that the agency furnish water "at the lowest possible cost," such language is hedged by references to "sound economy," "prudent management," and interest to bondholders. These references clearly give a local agency considerable discretion in balancing its own financial concerns against the requirement of low rates. Moreover, prudent management and sound business judgment would seem to mandate some sort of return on investment. First of all, a municipal utility would be foolish to increase its business risk by expanding service to nonresidents without getting some type of return commensurate with the increased risk. Second, a city that spends its funds to provide service to nonresidents and only recovers the cost of those funds is investing its money poorly. Instead of getting zero return by investing those funds in its own water system for the benefit of nonresidents, the city should invest elsewhere and get even a minimum return.

Thus, "lowest possible cost" cannot be read to mean "break-even cost"; rather, it would seem only to bar unreasonable or excess profits. ▮ It is not for the court to determine what constitutes sound economy and prudent management, but only to determine the narrow issue of whether the rates imposed are reasonable. (See *County of Inyo* v. *Public Utilities Com.*, *supra*, 26 Cal.3d 154; *Durant* v. *City of Beverly Hills*, *supra*, 39 Cal.App.2d 133; see also, *American Microsystems, Inc.* v. *City of Santa Clara* (1982) 137 Cal.App.3d 1037 [187 Cal.Rptr. 550].)[13]

Plaintiffs also argue Ventura violated its obligations as a trustee. ▮ When a city acquires the water system of another community, as to the water dedicated to the use of the outside community, the acquiring city holds "title as a mere trustee, bound to apply it to the use of those beneficially interested." (*South Pasadena* v. *Pasadena Land etc.* (1908) 152 Cal. 579, 594 [93 P. 490].) After the acquisition, the city is "under the same obligation as its grantor to *continue the service* and supply the water to all persons

---

[13]In *American Microsystems, Inc.* v. *City of Santa Clara*, *supra*, 137 Cal.App.3d 1037, ratepayers of a municipal power utility owned and operated by Santa Clara sought to compel that city to pass on to consumers certain savings in the cost of purchasing electrical power. The Court of Appeal rejected this argument, in spite of a provision in the utility's contract with the federal supplier of power that benefits be "'made available at fair and reasonable terms to all of its consumers *at the lowest possible rates consistent with sound business principles.*'" (*Id.*, at p. 1043, italics in original.) The court noted that unlike privately owned utilities which are regulated by the P.U.C., publicly owned municipal utilities are under no mandate to pass on to ratepayers any savings realized in the cost of service. Rather, the public entity is entitled to fix its utility rates pursuant to its legislative power, and courts will intrude only when rates are shown to be unreasonable or unfair: "it is not the function of the courts to evaluate the wisdom of the City's rate-fixing decisions. In that context, we cannot determine what constituted 'sound business practices,' but may only consider that narrower legal question whether the rates were unreasonable or arbitrarily established." (*Id.*, at p. 1044.)

who may become entitled to it in the future . . . ." (*Id.,* at p. 593, italics added.)[14]

It is clear that the trustee city must continue to supply water, but there is no support for the proposition that a city must supply water at cost. In fact, *Durant* made quite clear that an acquiring city's trust obligation does not require furnishing water at cost but only at a reasonable rate: "When the city purchased the private plant it assumed a trust to perform the contract and meet the obligations of the private concern. . . . The obligation which the city assumed through the purchase of the system was an obligation to continue to serve plaintiff water at a *reasonable* rate." (*Durant, supra,* 39 Cal.App.2d at p. 138, italics in original.)

## V

Plaintiffs argue that it is a denial of equal protection for nonresident ratepayers to be separately classified and required to pay a 70 percent surcharge over rates paid by resident taxpayers. They argue the surcharge is based solely on the nonresident status of the out-of-city customers, and that the only distinguishing factor between those who pay the surcharge and those who do not is an artificial political boundary line.

First, plaintiffs argue the nonresidents are a suspect class and therefore that we should apply the strict scrutiny test. They reason that the rationale behind the application of the "suspect class" doctrine is the political powerlessness of such groups. Because out-of-city users have no right to vote for or against city council members who set the water rates, they contend they are politically powerless and accordingly that the rationale of the suspect class doctrine militates towards its application in this case.

We have categorized only a few classifications as suspect, namely classifications involving race, alienage, or national origin. We decline to extend the suspect class analysis here. The plaintiffs are no more powerless as customers of Ventura than they were as Mound and Saticoy customers. Although they cannot vote in Ventura elections, they can exert political influence in alternate ways: through lobbying, petitions, testimony at hearings, for example. As a practical matter, most utility rate decisions turn on rate hearings, and in fact, plaintiffs were represented by a member of the county board of supervisors at the very hearing in question. Moreover, despite plaintiffs' contention that Ventura forced them into its water system,

---

[14]It is because of the trust relationship that consumers can "sue to enjoin rates which are themselves 'unreasonable, unfair, or fraudulently or arbitrarily established' [citation], or which discriminate without a reasonable and proper basis [citation]." (See *Inyo, supra,* 26 Cal.3d at p. 159.)

this is not the case. As members of a mutual water company, former Mound customers were the same shareholders who approved the sale to Ventura. The Saticoy transaction was approved by the P.U.C., and there is no evidence that a single protest was received.

Plaintiffs next argue that even if we apply the traditional rational-relationship test, they should prevail. We agree that this is the correct standard to use, but conclude that plaintiffs' argument is without merit.

██ When social or economic regulations are involved, the rational-basis test applies. In such cases, "'statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 502, 90 S.Ct. 1153] (quoting *McGowan* v. *Maryland* (1961) 366 U.S. 420, 426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101]).) The reasonableness test applied to municipal utility rates is somewhat more stringent than the bare rational-basis test. Ventura has met the reasonableness standard; a fortiori, it passes the rational-relationship test.

## VI Conclusion

We agree with the trial court that the rates imposed on nonresidents by Ventura are reasonable despite the fact that both nonresidents and residents received water from the same source and with the same quality of treatment. Moreover, the factors used by the trial court in resolving the issue of reasonableness are permissible criteria.

In administering a public utility, such as a water system, a city acts in its proprietary capacity. (*South Pasadena, supra,* 152 Cal. at p. 593.) When a municipal utility acquires the private water system of another community, the resident customers should not be forced to bear any of the costs of providing service to nonresidents. It is appropriate to pass on to the non-resident customers any extra cost the city has had to incur by way of expanding or modernizing facilities, in purchasing additional water, in increasing its business, or other similar costs. Moreover, it does not have to share the benefits for which it has already paid if such sharing is at the expense of residents. However, all these costs must be passed on at a proportional basis. For example, the nonresidents cannot be made to bear the cost of expansion or modernization properly attributable to in-city users.

The court is not required to determine all costs nor to balance them precisely against rates. Rather, it is the court's role to decide only whether a reasonable basis exists for charging different rates and whether the rates themselves are reasonable. In the present case, we conclude the Court of

Appeal erred in remanding the cause. Accordingly, the judgment of the appellate court is reversed.

Mosk, J., Reynoso, J., Lucas, J., and Panelli, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I agree with the majority, insofar as they conclude that the City of San Buenaventura is entitled to be compensated for services, facilities or capital which it contributes to the municipal utility and the ratepayers and that in lieu of such compensation the city ratepayers may be charged a lower rate than the noncity ratepayers. However, I cannot agree that the city is entitled to be compensated through discriminatory rates for claimed capital improvements and additions which were in fact financed by the ratepayers both within and without the city or obtained by donations to the water system.

In 1923 the city purchased a water system from Southern California Edison and commenced to provide water to the city and out-of-city consumers. The purchase was financed by general obligation bonds. Although the bond-holders had the right to require the city to levy taxes to pay for the bonds, it was contemplated that the bonds and the interest on them would be paid by water revenues. Over the years the city has issued similar bonds to purchase additional water systems and to obtain additional facilities. All payments of principal and interest on the bonds have been made from water revenues. An advance made by the city to the water company was repaid with interest, and so far as appears, city capital contributions have been negligible.

In 1935, the city established a surcharge on out-of-city customers requiring them to pay higher rates than the in-city customers. From 1935 to 1952, the surcharge averaged 48 percent; between 1953 and 1972 the surcharge was 32 percent. In 1972, the city imposed a 70 percent surcharge. The instant case involves the validity of the latter surcharge.

Over the years the water system has been greatly expanded and improved, and the value of the property devoted to the system including water rights and facilities has increased greatly. The main issue presented is whether the surcharge, or most of it, may be justified on the theory that the city is entitled to a rate of return based on the value of the property in the system.

In *County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154 [161 Cal.Rptr. 172, 604 P.2d 566], we considered the relationship between a city water department and out-of-city users. The Los Angeles Department

of Water and Power served consumers in the County of Inyo, and the county argued that the Public Utilities Commission should regulate the rates because it was established to protect people from the consequences of monopoly in the public services industry and that, while city residents may exert political power over the rates, outside residents have no voice as voters or taxpayers, leaving them at the mercy of the city. (26 Cal.3d at pp. 158-159.) The court held that, although the Legislature could authorize the Public Utilities Commission to regulate water rates charged by a city to noncity consumers, it had not done so.

In response to the county's argument that the consumers had no control over the rates charged, the court stated: "[A] city which acquires the water system of another community incurs an obligation to deal fairly with its customers in that community and to provide them with reasonable service at reasonable rates. (See *South Pasadena* v. *Pasadena Land, etc. Co.* (1908) 152 Cal. 579, 587-588, 594 [93 P. 490].) Such an acquiring city, as to the water dedicated to the use of the outside community, holds 'title as a mere trustee, bound to apply it to the use of those beneficially interested.' (*Id.*, at p. 594; see *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 138.) Consequently, the county can sue to enjoin rates which are themselves 'unreasonable, unfair, or fraudulently or arbitrarily established' (*Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 139), or which discriminate without a reasonable and proper basis (*Elliott* v. *City of Pacific Grove, supra,* 54 Cal.App.3d 53, 59).⁴" Footnote 4 states: "A showing that rates are discriminatory is in itself insufficient to fulfill the complainant's burden of proof (see *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 138); a showing, however, that such discrimination rests solely on the nonresident status of the customer, and not on the cost of service or some other reasonable basis, will prove the rate invalid (see *Elliott* v. *City of Pacific Grove, supra,* 54 Cal.App.3d 53, 59)." (26 Cal.3d at p. 159.)

When new users come into a municipal utility system, the city may properly charge connection fees or other charges to defray the cost of the facilities needed to serve the new users. (E.g., *Associated Homebuilders* v. *City of Livermore* (1961) 56 Cal.2d 847, 851 et seq. [17 Cal.Rptr. 5, 366 P.2d 448]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 233 [211 Cal.Rptr. 567].) However, *County of Inyo, supra,* 26 Cal.3d 154 makes clear that once a municipality chooses to dedicate its water service to consumers outside the city, it becomes a trustee bound to use the system for all of those beneficially interested, and any discrimination between consumers must be based on the cost of service or other reasonable basis. The lack of political power of out-of-city residents may not furnish a basis for discrimination but requires the city to act

reasonably in setting their rates. They are not second-class consumers but entitled to the same rights as other ratepayers.

Accordingly, we must determine whether the record shows that the discriminatory rates are based solely on the nonresident status of the consumers and not on the cost of service or some other reasonable basis. It is not claimed that the surcharge can be justified on the ground that it is more expensive to deliver water to the out-of-city consumers than the in-city consumers. Most of the out-of-city users live in islands of unincorporated territory surrounded by the city or areas adjacent to the city and the facilities used to deliver the water are the same for both types of users. Rather, most of the surcharge is sought to be justified on the basis of extra charges for the acquisition of water or for facilities serving the system.

As the majority recognize (*ante,* p. 1181) and as the evidence established, there are two alternative methods for determining the revenue requirements of a utility, the cash basis and the utility basis. Under both methods the water company is entitled to recover all of its operating and maintenance expense, including any taxes. Under the cash basis, the utility may add charges for system replacement, debt service expenses (principal and interest) and other capital costs, including additions to the facilities or reserves for additions. The total of the charges become the revenue requirement. Under the utility basis, charges for capital replacement, additions, reserves for additions and debt repayment are not included; rather, the utility recovers for depreciation of its plant and a rate of return on its rate base or investment. (See *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 336, 346-347 [102 Cal.Rptr. 313, 497 P.2d 785].)

Under the utility basis, it should be improper to include in the rate base capital assets donated or paid for by the ratepayers because such assets may not be viewed as investment. The point is illustrated by *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 663-664 [44 Cal.Rptr. 1, 401 P.2d 353]. There the Public Utilities Commission concluded that Pacific Telephone and Telegraph Company (Pacific) could properly include in its rate base its gross working cash requirement but the commission disallowed various additional cash sums held by Pacific which had been collected from customers in advance, from funds collected to pay debenture interest, and from taxes withheld from employees. The disallowed sums exceeded the working cash requirement. The court approved as sound and fair the commission's view that when the funds supplied by "'others than investors are greater than the amount required . . . for working cash, and the excess amount is not deducted from rate base, customers would be unreasonably required to pay a return on funds supplied by them to defray reasonable expenses and taxes [and debenture interest] and to provide a reasonable return on invested funds.'"

The principle is clear. The utility may not be permitted to include in its rate base donations or assets supplied by the ratepayers because to allow inclusion in rate base would permit "a double return." (*Id.*, at p. 664.)[1] It

[1]The Court of Appeal in the instant case in an opinion by McMahon, J., assigned, reached the same conclusion on the basis of other authorities. The court stated: "*The Donated Property Should Have Been Excluded From the Rate Base.* [¶] Customer donations of plant are normally excluded from the rate base on the theory that it would be inequitable to permit the utility to earn on property provided by the customers themselves. (*Conejo Valley Water Co.* (1965) 64 P.U.C. 212, 225; *La Puente Cooperative Water Co.* (1966) 66 Cal.P.U.C. 614, 626; *Sutter Butte Canal Co.* v. *Railroad Com.* (1927) 202 Cal. 179, 190-191 [259 P. 937] (affd. 279 U.S. 125 [73 L.Ed. 637, 49 S.Ct. 325]); *Public Utilities Commission* v. *Northwest Water Corp.* (1969) 168 Colo. 154 [451 P.2d 266, 276-277]; *Application of Kaanapali Water Corp.* (Hawaii App. 1984) 678 P.2d 584, 590-592; *United Gas Corp.* v. *Mississippi Public Service Com'n.* (1961) 240 Miss. 405 [127 So.2d 404, 412]; *Cogent Public Service* v. *Ariz. Corp. Com'n.* (1984) 142 Ariz. 52 [688 P.2d 698, 701-703].)

"An Illinois court reasons that it is proper to exclude contributions in aid of construction made by customers; the propriety of a reasonable depreciation deduction is not dependent upon the source of funds for the original construction of the facility, as the utility will have to replace obsolete properties. (*Du Page Utility Co.* v. *Illinois Commerce Comm.* (1971) 47 Ill.2d 550 [267 N.E.2d 662, 668-669], cert. den. 404 U.S. 852 [30 L.Ed.2d 62, 92 S.Ct. 74].) However, most courts reason that the purpose of depreciation is not to replace property but to recover the original investment over the life of the property. 'Since the company has invested no funds in contributed property, it is not entitled to recover the original investment through depreciation. . . . We believe it inequitable to allow a company to recover depreciation accruals on plants in which it has made no investment.' (*Mechanic Falls Water Co.* v. *Public Utilities* (Me. 1977) 381 A.2d 1080, 1104; accord *State* ex rel. *Martigney Creek Sewer Co.* v. *Public Service Commission* (Mo. 1976) 537 S.W.2d 388, 399; *State* ex rel. *Utility Commission* v. *Heater Utilities* (1975) 288 N.C. 457 [219 S.E.2d 56, 62]; *Sunbelt Utilities* v. *Public Utility Commission* (Tex. 1979) 589 S.W.2d 392, 395; *Princess Anne Utilities Corporation* v. *Commonwealth* ex rel. *State Corporation Commission* (1971) 211 Va. 620 [179 S.E.2d 714].)

"What about federal grants and funds derived from federal revenue sharing? One court has reasoned that 'the city has unqualified ownership of the portion of the plant built with the money and the fact that some infinitesimal portion of the money might be considered to have come from taxes paid by the out-of-city consumers does not create equities in their favor.' (*City of Covington* v. *Public Service Commission* (Ky. 1958) 313 S.W.2d 391, 393.) On the other hand, a Wisconsin court, in a valuation proceeding, excluded federal contributions on the theory that the federal grant was made for the benefit of both the town and the city and '. . . the city should not now be heard to claim that they should receive compensation for a portion of the water utility which was never paid for by them either directly or indirectly.' (*City of St. Francis* v. *Public Service Commission* (1955) 270 Wis. 91 [70 N.W.2d 221, 225-226].)

"Most courts which have considered the problem have excluded federal grants from the rate base. (See, e.g., *Pichotta* v. *City of Skagway* (D.C. Alaska 1948) 78 F.Supp. 999, 1006 [$39,973 expended by army in rehabilitating the system during World War II was excluded from the rate base, as the rule allowing additions was never intended to embrace a gratuitous contribution to capital made at the taxpayers expense]; *In re Southern California Edison Co.* (1954) 53 Cal.P.U.C. 385, 410; 6 P.U.C.3d 161, 185-186 [donations from governmental entities were not 'investment']; *City of Detroit* v. *City of Highland Park* (1949) 326 Mich. 78 [39 N.W.2d 325, 333] [federal funded contributions were excluded from rate base of municipally owned utility]; *City of Hagerstown* v. *Public Service Commission* (1958) 217 Md. 101 [141 A.2d 699] [in setting rates to utility serving outside customers, both customer contributions and federal grants were excluded from the rate base].)

"We agree that both acreage fees, connection fees, and other donations should be excluded from the rate base, in calculating any surcharge to nonresidents. As to federal contributions

is only the investment made by the utility which may be included in the rate base.

So far as appears in the instant case there has been no substantial investment of capital in the water system by the city. Although the city initially advanced funds to the water system, the advances were treated as a loan by the city rather than a capital investment and were repaid with interest.

The majority suggest other bases for concluding that the water facilities may be viewed as investment by the city warranting establishment of a rate base and justifying the city receiving a rate of return which can be used to reduce rates paid by city customers.

First, it is urged that the city is entitled to claim the assets of the system as investment because payment of the bonds used to acquire many of the assets and the State Water Project obligations was guaranteed by the residents of the city whose property was subject to taxes if the water company could not pay the bonds or obligations. However, it is clear that it was always contemplated that the principal and interest on the bonds and the project obligations would be paid from revenues of the water system and in fact that is what has occurred. In the absence of any significant capital contribution by the city, it is unreasonable to permit the city to establish the assets acquired by the bond funds or the project obligation to be viewed as investment by the city rather than the ratepayers.

Second, the city points out that it has provided services and facilities to the water system. As pointed out at the outset of this opinion, I agree that the city is entitled to be compensated for any services or facilities made available to the water system and rather than accept compensation the city may properly discount the rates charged in-city consumers. However, the discount should be reasonably related to the value of services and facilities. It is not. The discount was more than 10 times the amount which the city claimed as the value of its services and facilities made available to the water company.[2] Because the discount, so far as appears, greatly exceeded the value of the services and facilities contributed by the city, there is no reasonable basis to conclude that the city's contributions of services and facilities furnished substantial investment capital warranting a rate of return.

and grants, the same result should obtain; it is unfair to require those who have paid federal income taxes to pay for the proverbial 'pork barrel' a second time." (Fn. omitted.)

[2]The additional revenue due to the 70 percent surcharge during the fiscal years 1972-1973 through 1976-1977 totalled approximately $1.4 million. During the period the ratio of city consumers to out-of-city consumers ranged from approximately five to one to six to one. Assuming, as the majority conclude, that the out-of-city consumers paid a reasonable rate, the discount allowed city consumers from the reasonable rate would be at least $7 million (5 × $1.4 million). During the period the city claimed unreimbursed expenses of $629,000.

The trial court found that over the years the water system has "generally proven to be self-sustaining." To allow a rate of return based on the city services and facilities would permit the city a double recovery.

It is also argued that the water system was built on the basis of revenues obtained from ratepayers and that when the city added new ratepayers the old ones who helped build the system were entitled to a rate differential based on the value of the existing system. However, this is not the basis of the discriminatory rates. Thus, when in 1969 the city acquired the Saticoy Water Company, 60 percent of the Saticoy consumers were city residents and 40 percent nonresidents. Only the nonresidents paid the surcharge; the 60 percent of the new users who were city residents paid the discounted rate. The converse is also true; "old" users outside the city are required to pay the surcharge. Prior to the Saticoy acquisition, about 1,000 of the service connections were outside city limits with 12,600 within the city.[3] The 1,000 noncity consumers, the "old" users who helped to pay for the system, are required to pay the surcharge unless their property was annexed to the city.

It is also implied that the discrimination may be justified because after the purchase of the out-of-city companies the consumers of those companies received improved service and water quality. Fixing utility rates on the basis of the value of the service provided would be a repudiation of our long history of determining utility rates on the basis of cost.

The record here is clear that the system has been paid for and is being paid for by the ratepayers, both within and without the city, and the city has not made a significant capital contribution warranting the establishment of a rate base composed of the assets of the system and an allowance of a rate of return on that rate base. When the ratepayers have paid for the system, requiring them to also pay a rate of return to the city on the assets of the system in the absence of a significant capital investment is to charge them twice for the investment. Although the rate of return may be used for replacement, improvement and additions to the system, it is improper to discriminate against the out-of-city consumers by requiring them to furnish excessive amounts for those purposes. Rather, when the city chose to dedicate its system to serve out-of-city consumers, they became entitled to the same rights as to reasonable rates as the city users. Discrimination in rates can be justified on the basis of differentials in cost in delivering water or

---

[3]After the acquisition, there were apparently 18,000 city customers and 2,800 customers outside the city.

on the basis of city contributions but not on the basis of fictitious capital contributions.

Bird, C. J., concurred.

Appellants' petition for a rehearing was denied February 5, 1987.