## Gerard J. Kirchner; Franklin Kellogg and Marion Kellogg v. John C. Giebink and West Hill Development Corp. and Stowe Club Associates, et al.

[552 A.2d 372]

No. 85-431

Present: **Allen, C.J., Peck and Dooley, JJ., and Barney, C.J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned**

Opinion Filed May 13, 1988

Motion for Reargument Denied June 28, 1988

*Stevens & Elliott*, Stowe, for Plaintiffs-Appellants.

*Lisman & Lisman*, Burlington, for Defendants-Appellees Giebink and West Hill Development Corp.

*David A. Barra* of *Paul, Frank & Collins, Inc.*, Burlington, for Defendants-Appellees Dresser, O'Brien, Demeritt, Stowe Board of Selectmen, and Town of Stowe.

**Dooley, J.** Plaintiffs, residents of Stowe, appeal from a superior court order dismissing their action to nullify an agreement between the Town and a developer with respect to expansion of the town sewage facility. We affirm in part and remand in part for further proceedings consistent with this opinion.

Following discussion at a regularly scheduled meeting, in May, 1985, the town selectmen entered an agreement with Stowe Club Associates (SCA), under which SCA's proposed hotel and condominium project could dispose of 40,000 gallons per day of its sewage at the municipal treatment plant if SCA agreed to pay for the costs of upgrading the plant's capacity from 200,000 to 250,000 gallons per day. The upgrade consisted mainly of constructing a flow equalization tank and a 1.5 mile sewer line to connect with the existing line. SCA agreed to convey the sewer connection line and other improvements to the Town. The Town agreed to obtain easements for the extended sewer line and to repay SCA for part of its costs should other users connect to the line.

Following execution of the agreement a petition was circulated calling for a town vote at a special town meeting. The trial court found that more than five percent of the town's registered voters signed the petition, but the selectmen, on advice of counsel, declined to call such a meeting. Plaintiffs filed a class action in the Lamoille Superior Court in July, 1985, seeking a declaration that the agreement was invalid and an injunction against the selectmen and SCA acting on the agreement until it was approved by the voters. Plaintiffs sought relief on four main theories: (1) the agreement called for the "construction of a sewage disposal plant" and thus needs voter approval under 24 V.S.A. § 3618; (2) because 5% of the voters signed a petition demanding a special town meeting on the agreement, such a meeting must be held with the result binding the town; (3) the agreement must be approved by the voters of the town because the town charter requires a vote whenever town real estate is purchased or sold; and (4) the agreement contemplates the levying of special assessments

which require a town vote under 24 V.S.A. § 3254. Plaintiffs also alleged that their fundamental right to vote was impaired by the action of the selectmen.

The court certified the action as a class action under V.R.C.P. 23 and after trial concluded that the selectmen had acted properly, pursuant to their broad authority under 24 V.S.A. chapters 97 and 101. The court rejected plaintiffs' statutory arguments and concluded that their constitutional rights were not violated by the lack of a special town meeting. Accordingly, it dismissed the complaint and this appeal followed. The issues here are the same as those in the trial court and we take them in order.

■ Plaintiffs' first claim relies on 24 V.S.A. § 3618,[1] which states:

> Any section [action] taken by such municipal corporation under the provisions of this chapter or relating to the matters therein set forth, may be taken by vote of the legislative body of such municipal corporation, excepting the issuance of bonds and, in municipalities wherein such body is not otherwise given the power to levy taxes, the levying of a tax under section 3613 of this title; provided, however, that no action shall be taken hereunder unless the construction of a sewage disposal plant shall have first been authorized by majority vote of the legal voters of such municipal corporation attending a meeting duly warned and holden.

Plaintiffs contend that the agreement between SCA and the Town contemplates the Town's "construction of a new, improved and expanded sewage plant and system for the town" within the meaning of § 3618. They further contend that neither chapter 97 nor chapter 101 of Title 24 authorizes the selectmen to undertake more than maintenance, operation, and repair of existing systems. Specifically, they contend that the selectmen cannot undertake construction, which they argue is implied in any expansion and improvement of the system.

It is crucial at the start of our analysis to emphasize that absent some specific statutory limitation on their authority, the

---

[1] Within 24 V.S.A. ch. 97, § 3502 describes the general powers of municipalities to construct and operate sewage systems, and § 3503 allows municipalities to contract with other entities, including, "any corporation and individuals" for the disposal of sewage. Within 24 V.S.A. ch. 101, § 3602 grants municipalities the power to construct and operate sewage disposal plants.

selectmen have the general supervisory power over town matters. 24 V.S.A. § 872. In *Lawton* v. *Town of Brattleboro*, 128 Vt. 525, 529, 266 A.2d 816, 819 (1970), this Court observed:

> A formal vote of the electorate is not an indispensable prerequisite to the authority of the selectmen to function in this area of their official responsibility.

(citation omitted). In *Okemo Trailside Condominiums, Inc.* v. *Blais*, 135 Vt. 500, 503, 380 A.2d 84, 87 (1977), we recognized the broad powers of the selectmen to decide the sewage system capacity "and how much, if any, can safely be contracted away . . . ." The legislature can create exceptions to the broad authority of the selectmen, and, in fact, the requirement of 24 V.S.A. § 3618 that voters approve construction of a sewage disposal plant is a good example of such a specific limitation. The question before us is whether this limitation applies to this case.

It is also clear that the legislature intended to grant broad powers to a municipality with respect to sewage disposal. For example, 24 V.S.A. § 3613 provides that "[f]or the purpose of adequately making disposal of sewage . . . and operating its sewage plant . . . and making such improvements as may be necessary," the municipality is authorized to: (1) "take and hold real and personal estate"; (2) "borrow money"; and (3) "levy and collect taxes . . . necessary for the payment of municipal corporation sewage and sewage disposal expenses and indebtedness . . . ." By virtue of 24 V.S.A. § 3618, these broad powers are lodged in the selectmen unless there is a specific exclusion to this grant of power.

It is undisputed in this case that the initial construction of the town sewage treatment plant was undertaken and approved in accordance with § 3618, but plaintiffs contend that we should construe the statute to regard any expansion of a plant as additional "construction" requiring a new vote. Despite plaintiffs' emphasis on limiting its proposed reading of the statute to "improved and expanded" treatment plants, such a reading would not distinguish substantial expansion projects from relatively minor ones — all would be subject to voter approval. All changes in the physical

configuration of the plant other than maintenance could raise questions as to whether voter approval was needed.[2]

More importantly, the statute contains no such distinction. While the meaning of the term "construction" is not defined in the statute and the question has not previously come before this Court, similar questions have been posed in other states. In *State ex rel. Taxpayers League* v. *Noll*, 11 Ohio St. 3d 190, 191, 464 N.E.2d 1007, 1009 (1984), plaintiff demanded a referendum pursuant to the Ohio Constitution, which provided for such a referendum where:

> Any municipality proceeding to acquire, construct, own, lease or operate a public utility, . . . shall act by ordinance and no such ordinance shall take effect until after thirty days from its passage.

The municipality involved was substantially enlarging and improving its existing sewage system pursuant to an ordinance that had been in effect over thirty days. The court, relying on prior Ohio case law,[3] held that once a sewage system has been duly approved and operated by a municipality as a public utility, an ordinance providing for even substantial reconstruction, alteration, rebuilding, enlargement or improvement did not require a referendum. *Id.* at 191, 464 N.E.2d at 1009.

In *Illinois Power Co.* v. *City of Jacksonville*, 18 Ill. 2d 618, 624-25, 165 N.E.2d 300, 304 (1960), the statute provided that "no municipality shall acquire or construct a public utility unless such action is first approved in a referendum vote of the electors of the city." The court explained the intent of the statute in the following way:

> The question for the voters is one of policy — shall the city go into the public utility business? Having decided, as has the city of Jacksonville, to enter into municipal ownership of

---

[2] It would not have been improper for the legislature to have distinguished between substantial additions or improvements to a sewage treatment plant, to be considered "construction," and those that were minor or routine, which would not be considered "construction." The consolidated sewer district statute has such a distinction between "improvements" and "costs." See 24 V.S.A. § 3672. Act 250 contains such a threshold test for "any substantial change" to a pre-existing subdivision or development. 10 V.S.A. § 6081(b).

[3] *State ex rel. City of Fostoria* v. *King*, 154 Ohio St. 213, 94 N.E.2d 697 (1950).

a public utility, no policy decisions requiring voter approval are thereafter required by section 49-3.

The Illinois Supreme Court read the referendum provision as asking whether the municipality had voter approval to go into the utility business, a threshold decision with diverse implications about the nature and extent of municipal government. Once the municipality had voted to go into the utility business, the court held that a further vote of the municipality was unnecessary for expansions of the utility — in that case, in order to construct a transmission line to import power from another municipality. While there are differences between undertaking a business and merely constructing a sewage facility, there are also strong similarities. On balance, the logic of both *Noll* and *Illinois Power* applies to the case at bar. And see *Baird* v. *Webster City*, 256 Iowa 1097, 130 N.W.2d 432 (1964) (city can, without vote, terminate lease of gas utility to private company and operate the utility itself); *Indiana Service Corp.* v. *Town of Warren*, 206 Ind. 384, 189 N.E. 523 (1934) (town can install diesel engines in electric power plant to rehabilitate it without a vote even though there was a five year gap in the generation of electricity); and *Slepicka* v. *City of Wilber*, 150 Neb. 376, 34 N.W.2d 646 (1948) (city can buy equipment to improve and enlarge electric plant without a vote).

Plaintiffs next argue that the trial court erred in concluding that the selectmen were not bound to call the town meeting which they sought under 17 V.S.A. § 2643. That section commands the selectmen to call a special meeting of the town "on the application of five percent of the voters." Plaintiffs argue from this section that the selectmen had a duty to call a meeting where the town could vote not to be bound by the agreement signed by the selectmen. The trial court dismissed this claim pursuant to our decision in *Royalton Taxpayers' Protective Association* v. *Wassmansdorf*, 128 Vt. 153, 260 A.2d 203 (1969).

*Wassmansdorf* involved a suit by town residents who, armed with a petition signed by five percent of the town voters, sought a town meeting to reject a grand list that had been accepted by the voters a number of months before. The Court found that the grand list was final and could not be rejected by the voters. Thus, the Court held:

> The relief sought by the petitioners in the various articles of their petitions is beyond the power of any town meeting

to vote or order . . . . We hold that it was not the legislative intent in enacting [the predecessor of 17 V.S.A. § 2643] to compel the selectmen of a town to hold a special town meeting upon application of five percent of the voters for a useless, frivolous or unlawful purpose.

*Id.* at 160, 260 A.2d at 207; see also *Brewster* v. *Mayor of Rutland*, 128 Vt. 437, 266 A.2d 428 (1970) (Court will not compel referendum on public housing where decision is solely that of housing authority).

This case is governed by *Wassmansdorf*. If the selectmen had the power to make the agreement, then it is legally binding and the voters could not undo it. Thus, the meeting would be useless under *Wassmansdorf*. If the selectmen didn't have the power to make the agreement, then it is invalid irrespective of the call for a meeting. Thus, plaintiffs' claim under 17 V.S.A. § 2643(a) adds nothing and was properly dismissed.

The same conclusion applies to plaintiffs' claim that their federal civil rights were violated (42 U.S.C. § 1983) when they were deprived of their right to vote in a town meeting. Because there was no right to call a meeting for the purpose of considering the agreement in question, there was no deprivation of such right under the color of law and consequently no cognizable federal civil rights action. See 3 J. Cook & J. Sobieski, Civil Rights Actions ¶ 8.01, at 8-1 (1987) ("section 1983 establishes no substantive rights" but instead gives a remedy for rights otherwise established by federal law).

■ As a third, separate claim, plaintiffs argue that § 202(b) of the Stowe Town Charter, adopted pursuant to 24 V.S.A. § 703 (now 17 V.S.A. § 2645), requires a town vote on the agreement. The charter provides:

(b) the town may acquire real property within or without its corporate limits for any town purpose, in fee simple or lesser interest or estate, by purchase, gift, devise or lease, and may sell, lease, mortgage, hold, manage and control such real property as its interests may require. The town may further acquire property within its corporate limits by condemnation where such authority is granted to towns by the statutes of the state of Vermont. The vote of the town shall be required for purchase or sale of any real property.

Plaintiffs are not specific in their theory of how the agreement constitutes a "purchase or sale of any real property" as those terms appear in § 202(b) of the charter. Our review of the agreement does not clearly show a "purchase or sale" of real property. To the extent real property will be transferred pursuant to the agreement it will go to the Town entirely at the expense of SCA. While the Town is obligated to obtain and grant easements and rights of way, the costs connected with these interests are borne by SCA. Eventually these interests will revert to the Town with the sewer connection line.

Even if plaintiffs could demonstrate how the agreement includes a purchase or sale of real property, we could not hold that the charter requires that it be submitted to the voters. 24 V.S.A. § 3613 makes it clear that the municipality has the power to take and hold real and personal estate to make improvements in its sewage plant and to provide for the disposal of sewage. By virtue of 24 V.S.A. § 3618, that power is given to the selectmen because no other provision requires a town vote. The general charter provision does not control in light of this specific statutory scheme. See *Becker* v. *Selectmen of the Town of Bennington*, 123 Vt. 6, 178 A.2d 399 (1962). The situation is similar to that present in *Lawton*, 128 Vt. at 528-29, 266 A.2d at 819, where the plaintiff alleged that the town charter should be construed to require that any garbage connection agreement be submitted to the voters.[4] The Court noted that the charter stated that it would not be construed to limit the powers and functions conferred upon the town and selectmen by the statutes so that the selectmen's powers in the charter should be viewed as "cumulative, rather than restrictive." *Id.* at 530, 266 A.2d at 819. Because the Court found that the statutes do not make "[a] formal vote of the electorate . . . an indispensable prerequisite to the authority of the selectmen to function in th[e] area of their official responsibility," the selectmen could enter into the garbage collection contract. *Id.* at 529-30, 266 A.2d at 819. We also note that the charter of the Town of Stowe has a provision on selectmen's powers nearly iden-

---

[4] The charter in *Lawton* was enacted by the Vermont Legislature. The charter in this case was adopted by the town pursuant to former 24 V.S.A. § 703, now recodified as 17 V.S.A. § 2645, and apparently was never reviewed by the legislature. We offer no opinion on whether the difference in the source of power for the charter provisions has any impact on their effect.

tical to that relied on in *Lawton*. See Charter of the Town of Stowe, § 205.

■ As a final claim, plaintiffs allege that the agreement violated 24 V.S.A. § 3254, because it provides for the levying of a special assessment without vote of the town. 24 V.S.A. § 3254 provides:

> A special assessment under this chapter shall be levied only by vote of a majority of the qualified voters of the municipality voting at an annual or special meeting duly warned for that purpose. However, the question need not be submitted to the voters if all of the owners of record of property to be assessed, or of any interest therein, other than mortgagees or lien holders, consent in writing to the assessment. Either the vote or the consent shall include approval of the method of apportionment of the assessment.

A special assessment is defined as "a tax assessed against one or more properties receiving the benefit of a particular public improvement, as distinguished from a tax on the entire grand list of a municipality." 24 V.S.A. § 3251(4). We agree with plaintiffs that an agreement by the Town to levy special assessments without following the statutory procedure would be unenforceable, but the issue — at least initially — is whether the agreement provides for any special assessments. Plaintiffs argue that it does because the Town must "charge fixed rates for those who either agree or are forced to hitch on to the expanded system."

To evaluate plaintiffs' claim, we must look at three specific provisions of the agreement requiring the Town to assess charges on users. Section 3 requires persons connecting to the flow equalization tank and "improvements to the Town's treatment plant" to pay $100 for an existing single family residence or $7.00 per gallon capacity allocated for any other type of structure. Under section 4 of the agreement, persons paying the $7.00 fee under section 3 who also connect to the proposed new sewer connection line to be constructed by SCA must pay an additional $2.00 per gallon of allocated capacity. The fees under section 4 would be paid to SCA to offset its costs, according to a formula set forth in the section. Section 8 provides that after SCA and the Town expand the system's capacity to one million gallons (the expansion and SCA's contribution to it are described in section 7), the Town must charge each person (other than those persons described as

'developers') who connects to the sewer improvements a fee of $100 for an existing single family residence and a formula fee for any other structures. These fees would also be used to repay SCA for its contribution to the expansion costs.

Defendants' main response to this claim, which was accepted by the trial court, is that the agreement provides for user fees, not special assessments, and thus falls within the powers of the selectmen as the board of sewage disposal commissioners (24 V.S.A. § 3614) to set rates and rents (24 V.S.A. §§ 3507, 3615, 3616). In effect, the trial court concluded without making specific findings that no provision of the agreement contemplated special assessments, because the charges to be imposed on users were nothing more than sewer rates, within the power of the selectmen to set without a confirming vote of the Town.

To evaluate defendants' claim, we must look at the statutory authority of the selectmen to set sewer rates as well as the legislative definition of special assessments. The authority to set rates is contained in a number of sections, principally 24 V.S.A. § 3615. That section authorizes "sewage disposal charges" based upon five possible means of determining a fair charge for use. One method is somewhat different from the rest because it authorizes charges not based on use, but instead based on the value of the premises served, when the selectmen make a determination that a plant is of general benefit to the municipality. In the title to § 3615, as well as in other statutory sections, the sewage disposal charges are referred to as rates or rents. See also 24 V.S.A. §§ 3504, 3507, 3616. The proceeds are used for both principal and interest on sewage disposal bonds and the expenses of the operation of the system. 24 V.S.A. § 3616.

A special assessment is clearly contemplated as something different from a rate or rent. It is a special kind of tax that is imposed upon only some of the properties in a municipality because of the special benefit to those properties of a particular public improvement. 24 V.S.A. § 3251(4). It is used for a limited range of purposes:

> Special assessments may be made for the purchase, construction, repair, reconstruction or extension of a water system or sewage system, or any other public improvement which is of benefit to a limited area of a municipality to be served by the improvement.

24 V.S.A. § 3252. The availability of a special assessment does not, however, "prohibit the financing of any of the improvements referred to in this chapter . . . by other means." 24 V.S.A. § 3256.

Based on the general meanings of the terms, the one-time connection charges contained in the agreement are closer to special assessments than to rates or rents. While rents are continuous charges imposed on the basis of use, an assessment levy is "in the nature of a tax; [and] is incurred only once and is collected from a landowner who is specially benefited by the sewer's construction . . . ." *Seal Tanning Co.* v. *City of Manchester*, 118 N.H. 693, 699, 393 A.2d 1382, 1386 (1978); and see *Jersey City Sewerage Authority* v. *Housing Authority of Jersey City*, 70 N.J. Super. 576, 580, 176 A.2d 44, 46 (1961). At least two of the three relevant sections of the agreement fit the description of special assessment and fail to meet the description of a rent or rate under the statute. The flat $100 "fees" for existing single-family residences connecting to system "improvements" under sections 3 and 8 do not meet any of the tests set forth in § 3615, but do have the qualities of an imposition on "properties receiving the benefit of a particular public improvement, as distinguished from a tax on the entire grand list of a municipality." 24 V.S.A. § 3251(4).

The fact that the connection charge is paid only by those who connect on to the line does not make the charge a rate or rent. See, e.g., *San Marcos Water Dist.* v. *San Marcos Unified School Dist.*, 42 Cal. 3d 154, 720 P.2d 935, 228 Cal. Rptr. 47 (1986). The whole point of a special assessment is that it is imposed only on those properties which receive the benefit of a particular public improvement. 24 V.S.A. § 3251(4).

We recognize that there are numerous decisions from other states on whether connection charges to pay for improvements in sewer or water systems are valid under the municipality's power to impose fees. See, e.g., *San Marcos Water* v. *San Marcos Unified School, supra; Loup-Miller Constr. Co.* v. *City & County of Denver*, 676 P.2d 1170 (Colo. 1984); *Hartman* v. *Aurora Sanitary Dist.*, 23 Ill. 2d 109, 177 N.E.2d 214 (1961); *Haymes* v. *Holzemer*, 3 Ohio App. 3d 377, 445 N.E.2d 681 (1981); *Teter* v. *Clark County*, 104 Wash. 2d 227, 704 P.2d 1171 (1985). Some of these decisions uphold the power to levy sewer connection fees on facts similar to those involved here. In most of these cases, the controlling statutes authorize flat one-time charges to be levied as "fees," despite arguable similarity of the charges to special assessments.

See, e.g., *Haymes, supra.* And while some cases uphold the municipal power to impose charges like those contemplated in the contracts at bar as fees, without affirmative statutory authorization, e.g., *Teter,* 104 Wash. 2d 227, 704 P.2d 1171, the courts in those cases did not face *limiting* statutory language like that in § 3615.

It must be conceded that the line between a rent or rate on the one hand and a special assessment on the other is not sharply defined in the present context, as cases in other jurisdictions suggest, even though they may all be distinguishable from the case before us. We think, however, in light of the relatively broad language in the special assessment statute and the very specific language of § 3615 granting power to the selectmen to impose rents or rates, that the agreements here in question contemplate special assessments and not fees. Accordingly, we cannot accept the holding of the trial court on this question.

Our holding that the agreement contemplates special assessments does not end the matter. Defendants correctly observe that the selectmen have not yet levied a special assessment and, therefore, the town vote provision of 24 V.S.A. § 3254 has not been triggered. Again, if the agreement would compel the Town, in effect, to levy a special assessment at some future time, the fact that the assessment is not implemented by execution of the agreement does not render the agreement lawful. But on the other hand, it is possible — under a variety of circumstances — that the agreement may never compel the Town to act inconsistently with the statute. For example, it is possible, as defendants allege, that the owners of property on whom the charges are to be imposed will "consent in writing to the assessment" and obviate the need for a vote. See 24 V.S.A. § 3254. This possibility may, in turn, depend on how the agreement is to be construed by the parties. Because the definition of "improvement" in the agreement is broad, for example, covering not only the new sewer connection line but the flow equalization tank and "improvements to the Town's treatment plant," it is not clear on the present record whether existing residences served by sewers at the present time could be assessed under any of the agreement's provisions, or whether the charges would be limited to new users connecting to the system.

We cannot determine on the sparse record available to us, and in light of the erroneous holding of the trial court, the effect of

our determination that the connection charges contemplated by the agreement are special assessments. It may be that the contract purposes and performance cannot be fulfilled without actions by the municipality that would violate the special assessment statute. Cf. *My Sister's Place* v. *City of Burlington*, 139 Vt. 602, 613, 433 A.2d 275, 282 (1981) ("A contract whose formation or performance is illegal may be held void and unenforceable . . . ."). On the other hand, it may be that the agreement can be construed such that the obligations of the Town are fully consistent with the law. It is up to the trial court, in the first instance, to construe the agreement in reference to existing law. Accordingly, we remand for the trial court to determine whether the Town's duty under the special assessment law renders the agreement invalid.

*The case is remanded to the superior court for further consideration of plaintiffs' claims, in accordance with this opinion, that the charges contemplated in sections 3, 4 and 8 of the agreement are special assessments. In all other respects, the decision of the trial court is affirmed.*