## Paul L. Handy and Catherine M. Handy v. City of Rutland and Town of Rutland

[598 A.2d 114]

No. 88-028

Present: Peck and Dooley, JJ., and Katz, Supr. J., and Connarn and Springer D.JJ. (Ret.), Specially Assigned

Opinion Filed December 28, 1990

Mandate Stayed January 31, 1991; Stay of Mandate Dissolved May 2, 1991

*Allen D. Webster* and *Mary G. Kirkpatrick* of *Lisman & Lisman*, Burlington, for Plaintiffs-Appellants.

*Henry C. Brislin*, City Attorney, Rutland, for Defendants-Appellees.

**Peck, J.** Plaintiffs, owners of a restaurant in the Town of Rutland, appeal from a decision of the superior court declaring that defendant City of Rutland has authority to impose and collect from them a one-time hookup fee for connecting to the City's sewage disposal system. We affirm.

The parties have stipulated to the facts. The City of Rutland owns and operates a sewage disposal facility. In 1973, the City entered into an agreement with the Town of Rutland to take and treat up to 55,000 gallons of town sewage per day from a town line which hooks into the city system. User rates were calculated on the amount of water used, and the City retained final authority to approve all future connections to the town sewer line.

In 1984, the City commenced work on expanding its treatment facilities, and entered into a new agreement with the

Town. That agreement established three user rates: (1) city users would be charged a "basic" rate related to water usage and operating costs; (2) current town users would be charged five times the basic rate; and (3) new town users would be charged five times the basic rate plus an ad valorem fee equal to 20% of the property tax levied by the Town on the property. The agreement further provided that during the interim period between the signing of the agreement and the completion of the new treatment facility, the City was free to negotiate any rate "it deem[ed] appropriate" with new town users.

Plaintiffs began operating a restaurant in the Town of Rutland during the interim period in March of 1986. In June of 1985, plaintiffs' predecessor in title had applied to the City's board of aldermen for approval to hook up to the city sewer lines. The board referred the matter to the intermunicipal agreement committee (IAC), which stated that it would recommend approval of a sewer contract for the restaurant after negotiation between the restaurant and the city attorney and resubmission of that contract to the IAC. There was no discussion of a one-time hookup fee.

In the fall of 1985, the city attorney called plaintiffs and advised them that their hookup had been approved, but that it would not be cheap—possibly costing as much as five times the city rate plus an ad valorem tax. He further advised plaintiffs that there was nothing for them to do at that point, and that he would contact them again to sign some papers. At the end of the conversation, the city attorney was under the impression that plaintiffs would contact him to sign an agreement when the hookup occurred. Plaintiffs' understanding was that the city attorney would contact them regarding the final sewer use rate. Sometime after that conversation and before plaintiffs' restaurant opened for business in March of 1986, plaintiffs hooked up to the city sewer line.

Two or three weeks after the restaurant opened, the new city attorney told plaintiffs that their hookup was unauthorized. He stated that the board of aldermen would probably charge the new town rate, but that some board members also wanted a one-time hookup fee. After several negotiating sessions and IAC meetings, the board of aldermen approved a hookup fee of $10,170, which represented $1.00 for each gallon per day allowed by plaintiffs' Act 250 permit.

Plaintiffs refused to pay the one-time hookup fee and filed suit in superior court to stop the City from imposing it. Plaintiffs claimed that the fee was not authorized by state statute and that imposition of the fee constituted an antitrust violation. The City counterclaimed to force plaintiffs to unhook and pay treble damages for the unauthorized hookup. The superior court held that the hookup fee was legal, but that the City was estopped from asserting that the hookup was without approval because the former city attorney had apparent authority to inform plaintiffs of the City's final approval. On appeal, plaintiffs reassert the arguments made before the trial court, and contend that the court erred by not considering whether the representations of the former city attorney estopped the City from charging the hookup fee.

## I.

■ ■ Plaintiffs first argue that the trial court's conclusion that the City has the statutory authority under 24 V.S.A. § 3615 to charge a one-time hookup fee for sewer service was erroneous. We disagree.

Both parties concede "that, absent a home rule constitutional provision, a municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." *Hinesburg Sand & Gravel v. Town of Hinesburg*, 135 Vt. 484, 485–86, 380 A.2d 64, 66 (1977) (town's processing and sale of eight times the gravel it needed for road repair was not incidental or subordinate to its statutory duty to maintain roads). Under 24 V.S.A. § 3611(a), a city may contract for sewage disposal with any corporation or individual. The city, through its board of sewage disposal commissioners,[1] may establish charges to be paid "in such manner as the commissioners may prescribe." § 3615. The charges may be based on the metered consumption of water, the number and kind of plumbing fixtures involved, the number of persons served, the appraised value of the premises, or "a combination

---

[1] The mayor and board of aldermen of a city constitute a board of sewage disposal commissioners. 24 V.S.A. § 3614.

of any of said bases or any other equitable basis." *Id.*[2] Further, "[t]he commissioners may change the rates of such charges from time to time as may be reasonably required." *Id.*

Plaintiffs rely heavily on *Kirchner v. Giebink*, 150 Vt. 172, 180–84, 552 A.2d 372, 377–79 (1988), for support of their argument that § 3615 does not give the city authority to impose a one-time sewage hookup fee. In *Kirchner*, residents of the Town of Stowe alleged that an agreement between the Town and a developer relating to the expansion of the town sewage facility violated state law because it levied a special assessment without a town vote. Pursuant to provisions of the agreement, a $100 fee was charged to all residences connecting to the sewer improvements. The specific issue was whether the $100 fee constituted a special assessment requiring a town vote, see 24 V.S.A. § 3254, or a sewer disposal charge authorized by § 3615. This Court held that "the one-time connection charges contained in the agreement are closer to special assessments than to rates or rents" because "rents are continuous charges imposed on the basis of use" rather than one-time assessments collected only from those who specially benefit from the construction of the sewer. 150 Vt. at 182, 552 A.2d at 378. The Court recognized that some decisions from other states had upheld a municipality's power to impose sewer connection fees, but noted that "the courts in those cases did not face *limiting* statutory language like that in § 3615." *Id.* at 182–83, 552 A.2d at 379 (emphasis in original).

■ *Kirchner* does not oblige us to conclude that the hookup fee in this case is not authorized. We first point out that in the present case the City imposed the hookup fee only when new interim users wanted to connect to the sewer system, not against all existing residences in the "improved" service area, as was the case in *Kirchner*. See *Haymes v. Holzemer*, 3 Ohio App. 3d 377, 381, 445 N.E.2d 681, 685 (1981) (assessment is levied against all property in service area, while fee is imposed only on new users). Further, while *Kirchner* implies that § 3615 does not authorize the imposition of connection fees, such a conclusion was not necessary to resolve the issue in that case—

[2] The Legislature amended § 3615 in 1989. Among other changes, the bases of the sewage disposal charges were expanded and reworded.

whether certain connection fees were special assessments rather than sewage disposal charges—and indeed the Court made no such conclusion. Here, the hookup fees cannot be city assessments because plaintiffs are nonresidents; therefore, the conflict between the two statutory sections that existed in *Kirchner* is not present, and the considerations addressed in that case are inapposite. Although § 3615 does limit the bases upon which a municipality may fix sewer rates, we conclude that the type of hookup fee imposed by the City of Rutland was within the scope of fees authorized by § 3615, which allows municipal sewer commissioners to establish charges to be paid "in such manner as the commissioners may prescribe."

■ Plaintiffs cite to the disparate treatment of other interim users as evidence that the imposition of their $10,170 hookup fee was inequitable and discriminatory. Specifically, plaintiffs point out that two pre-existing users, Howard Johnson's and Holiday Inn, applied during the interim period for additional allotments, and that the City approved the allotments but charged the new business rate (five times the basic rate plus an ad valorem charge) without a hookup fee. Although we agree that the City may not impose inequitable or discriminatory sewer rates, plaintiffs have not shown discrimination here. Unlike plaintiffs, Howard Johnson's and Holiday Inn were pre-existing users who had already contributed to the sewer system and who were seeking merely to increase their sewage capacities. It was not inequitable or discriminatory for the City to charge these dissimilarly situated applicants different rates.[3] Cf. *South Shell Investment v. Town of Wrightsville Beach*, 703 F. Supp. 1192, 1204 (E.D.N.C. 1988) (no equal protection violation where city charged residents fees not imposed on dissimilarly situated nonresidents), *aff'd*, 900 F.2d 255 (4th Cir. 1990).

Although the trial court stated that § 3615 does not require that the City's sewer charges be reasonable and that the City is

---

[3] Plaintiffs also argue that the court erred by not addressing their antitrust argument. Assuming arguendo that the antitrust statutes cited by plaintiffs are applicable here, the trial court explicitly ruled that plaintiffs had failed to show that the City discriminated against them, a necessary element to their antitrust claim. See 15 U.S.C. § 13(a). As noted above, we agree with the court's ruling.

under no obligation to offer reasonable rates to those beyond its territorial boundaries, both parties appear to presume that reasonableness is a proper criterion for review of extraterritorial rates. A number of courts have considered this question. Some of these courts have held that the reasonableness of extraterritorial sewer or water rates is not subject to judicial review. See *Payson Sanitary District of Gila County v. Zimmerman*, 119 Ariz. 498, 501, 581 P.2d 1148, 1151 (1978) (because sanitary district is under no obligation to furnish service beyond its boundaries, relationship to nonresident subscribers is governed by contract, and reasonableness of charges for nonresident access is not subject to judicial review); *Davisworth v. City of Lexington*, 311 Ky. 606, 611–12, 224 S.W.2d 649, 652 (1949) (same); *Bleick v. City of Papillion*, 219 Neb. 574, 576, 365 N.W.2d 405, 406 (1985) (city's furnishing of sewer service to nonresidents is contractual and permissive; therefore, statutory provisions requiring city to furnish service subject to reasonable rules apply only to residents); *Atlantic Constr. Co. v. City of Raleigh*, 230 N.C. 365, 369, 53 S.E.2d 165, 168 (1949) (city is free to establish by contract such sewer rates as it deems reasonable and proper); *Fairway Manor, Inc. v. Board of Comm'rs of Summit County*, 36 Ohio St. 3d 85, 88, 521 N.E.2d 818, 821–22 (1988) (where extraterritorial water rate is set by contract, the parties, not the courts, determine the proper rate to be charged), *cert. denied*, 488 U.S. 1005 (1989).

Many other courts, however, have held that though the yardstick for measuring the reasonableness of a city's extraterritorial rates may be different from that used to measure the reasonableness of resident rates, the reasonableness of any rate imposed by the city is open to judicial review. 12 E. McQuillin, Municipal Corporations § 35.37i, at 632–33 (3d ed. rev. 1986); see *Delony v. Rucker*, 227 Ark. 869, 872–73, 302 S.W.2d 287, 289–90 (1957) (municipality's charges to nonresidents must be fair and reasonable); *Hansen v. City of San Buenaventura*, 42 Cal. 3d 1172, 1180, 729 P.2d 186, 190, 233 Cal. Rptr. 22, 26 (1986) (city that acquires water system of another community must provide reasonable rates to its nonresident customers), *appeal dismissed*, 484 U.S. 804 (1987); *Bobrowicz v. City of Chicago*, 168 Ill. App. 3d 227, 233–34, 522 N.E.2d 663, 668 (once municipal utility undertakes to provide services to nonresident

via contract, utility has duty to charge reasonable non-discriminatory rates), *appeal denied*, 122 Ill. 2d 570, 530 N.E.2d 239 (1988).

■ The terms of contracts in which municipalities set sewer rates for nonresident customers are enforceable only if the rates are in compliance with applicable law. See 11 E. McQuillin, *supra*, § 31.30a, at 221 (3d ed. rev. 1983). Vermont law, which does not distinguish between resident and nonresident customers, requires that rates be fair, equitable and reasonable. See § 3615 (rates may be determined on any "equitable" basis; commissioners may change rates as "reasonably required"); *Kirchner*, 150 Vt. at 181, 552 A.2d at 378 (charges must be "fair"). Thus, the reasonableness of a city's extraterritorial sewer rates is an appropriate issue for judicial review.

■■ The reasonableness of extraterritorial rates, of course, is not linked solely to the cost of the hookup. In addition to recovering operating costs and capital costs associated with past, present or anticipated improvements of the facilities required to furnish the services,[4] a city may make a reasonable profit from extraterritorial rates. 12 E. McQuillin, *supra*, § 35.37i, at 632; see *Hansen*, 42 Cal. 3d at 1182, 729 P.2d at 192, 233 Cal. Rptr. at 27–28 (city may recover reasonable rate of return from fees imposed on nonresident customers). Further, because the rates established by a lawful rate-fixing body are presumed reasonable, the persons challenging the rates bear the burden of showing that they are unreasonable. *Hansen*, 42 Cal. 3d at 1180, 729 P.2d at 190, 233 Cal. Rptr. at 26; see *South Shell Investment*, 703 F. Supp. at 1203 (party challenging city rates has burden to come forward with evidence showing that fees are unreasonable).

In support of their contention that the hookup fee was unreasonable, plaintiffs argue that a memorandum from the city engineer and the planning coordinator, which stated that "[f]actors were chosen which would result in [plaintiffs] being

---

[4] Plaintiffs contend that § 3615 requires only industrial users to pay a share of the construction costs for sewage facilities. We disagree. Section 3615 requires industrial users to pay for construction costs "allocatable to the treatment of . . . industrial wastes."

charged a fee of roughly $10,000," shows that the hookup fee was based solely on "ability to pay" and, therefore, was arbitrary and unauthorized. We cannot agree. The hookup fee was based on the maximum amount of effluent that may be discharged under plaintiffs' Act 250 permit, certainly an "equitable" basis as required by § 3615.[5] The question is whether the per gallon charge was reasonable. Although plaintiffs have shown that city officials wanted to charge plaintiffs approximately $10,000 for hooking up to the city sewer system, they have not met their burden of proving that the $10,000 figure was unreasonable or arrived at in an arbitrary manner. They have presented no cost analyses or other evidence showing that such a fee was inappropriate. See *South Shell Investment*, 703 F. Supp. at 1203, 1206–07 (municipalities have great latitude in projecting anticipated costs for long-term capital improvements; the absence of a city cost analysis does not equate to an irrational decision).

In sum, plaintiffs have failed to show that the hookup fee is not authorized by law, discriminatory or unreasonable.

## II.

Plaintiffs also contend that the court erred by failing to address their estoppel argument, namely, that their fall, 1985 phone conversation with the former city attorney estopped the City from imposing any charges above those discussed during the conversation. We disagree. Plaintiffs raised the estoppel issue in their memorandum of law below only indirectly while addressing another argument, and then again in summary fashion in their reply memorandum. In total, in their memoranda below, plaintiffs devoted three sentences and one cite toward their estoppel argument. The one cite, *In re McDonald's Corp.*, 146 Vt. 380, 384, 505 A.2d 1202, 1204 (1985), holds that the person who invokes the estoppel doctrine has the burden of establishing each of its four elements. Plaintiffs did not address any of the specific elements in their memoranda or brief, either here or below.

---

[5] The City chose not to adopt other bases for rates allowed by § 3615 that are more closely related to ability to pay—appraised value or square footage of the premises.

The court held that the City was estopped from claiming treble damages for plaintiffs' unauthorized hookup, ruling that the former city attorney had told plaintiffs that the hookup had been approved. This ruling, however, does not imply that the tentative rates mentioned during the phone call estopped the City from later imposing a hookup fee. Further, given plaintiffs' indirect and inadequate briefing of the estoppel issue, the trial court did not err by not specifically addressing whether the rates mentioned over the phone estopped the City from imposing additional charges. See *Tallarico v. Brett*, 137 Vt. 52, 61, 400 A.2d 959, 964–65 (1979) (this Court is not required to consider a claimed error not adequately briefed or supported by argument); *Laird Properties New England Land Syndicate v. Mad River Corp.*, 131 Vt. 268, 282–83, 305 A.2d 562, 570–71 (1973) (where defendant made no request for findings on laches or equitable estoppel, and issues were not adequately presented so as to give court opportunity to consider them, they would not be considered on appeal).

*Affirmed.*