# Roy & Linda L'Esperance v. Town of Charlotte

[704 A.2d 760]

No. 96-532

Present: Amestoy, C.J., Gibson, Dooley and Johnson, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed October 3, 1997

*Mark A. Kaplan* and *Richard R. Goldsborough* of *Jarvis & Kaplan*, Burlington, for Plaintiffs-Appellees.

*Steven F. Stitzel* of *Stitzel & Page, P.C.*, Burlington, for Defendant-Appellant.

**Dooley, J.** Plaintiffs Roy and Linda L'Esperance sued to compel the Town of Charlotte to renew their lease for property on Lake Champlain under the same terms as their original lease. The superior court agreed that plaintiffs were entitled to renewal and granted them summary judgment. On appeal, the Town of Charlotte argues that (1) the lease violates Chapter I, Articles 7 and 9 of the Vermont Constitution, (2) the lease is invalid because it is contrary to public policy, (3) the lease is not supported by adequate consideration, and (4) the selectmen lacked authority to grant a lease that contained an option to renew beyond its initial fifteen-year term. We affirm.

The Town of Charlotte owns a large piece of property on Lake Champlain, known as Thompson's Point, and has subdivided it into lots that it leases as sites for homes and summer camps. In 1979, the Town entered into a fifteen-year lease with plaintiffs for a quarter-acre lot with one-hundred feet of lake frontage. The lease is referred to by the parties as a "ninety-times lease" because the annual rent is calculated by multiplying the town tax rate by ninety; in 1993, this calculation produced a rent of $138.60 per year. The lease was renewable for an additional fifteen-year period on the same terms. With the approval of the Town, plaintiffs placed a year-round residence on the lot, spending in excess of $50,000 on the building and improvements. The residence is currently appraised at $86,108 and results in an annual property tax liability to the Town of $1,369.

In July 1993, Roy L'Esperance notified the Town of his intention to exercise the option to renew on the lease. By letter dated September 1993, the Town informed plaintiffs that it would renew the lease only if they agreed to new terms, including higher rental payments. The proposed lease would set the rent by multiplying each $10,000 of appraised lot value times 200; based on the last appraisal, the rent proposed by the Town would be $1,288 per year. Plaintiffs sued to enforce the option to renew on the same terms as the original lease and were granted summary judgment by the trial court in May 1995.[1] The Town appealed to this Court, and we reversed and remanded the matter to the trial court to resolve an issue of material fact as to whether the Town had waived timely notice of renewal. See 165 Vt. 640, 683 A.2d 17 (1996) (mem.) (unpublished). On remand, the court found that the Town had waived any objection it had to the late notice of renewal of the lease. The Town then filed this appeal.

There is no dispute that the lease requires the Town to renew for an additional fifteen-year term at the same rental rate as the initial term. Thus, the Town seeks to avoid enforcement of the lease on a number of theories. Central to its arguments is the fact that the lease has become a bad deal for the Town. In the decade before 1979, the Town's property tax rate reached $7.30 per hundred dollars of appraised value. At this rate, the annual rent under the ninety-times lease would have been $657. Apparently, the Town expected that the rent calculation would continue to produce a fair return over the years.

---

[1] The United States District Court has also decided a virtually identical case, reaching the same result as the trial court and this Court. See *Rutter v. Town of Charlotte*, No. 2:93-CV-391 (D. Vt. May 27, 1995).

The Town miscalculated. Valuation assessments increased to fair market value, and the tax rate fell below $2.00 per hundred dollars of appraised value in the 1980's. As a result, the rents paid by ninety-times leaseholders decreased at the same time as lakeshore property values sharply increased. Where it could, the Town changed the rent-calculation formula to $2.00 per hundred dollars of appraised value. At this rate, plaintiffs would pay rent of $1,288 per year.

The Town's first claim is that the annual rent in the original lease violates Chapter I, Articles 7 and 9 of the Vermont Constitution.[2] Article 7, known as the Common Benefits Clause, provides in relevant part:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community . . . .

The rights guaranteed by the Common Benefits Clause are generally coextensive with those protected under the Equal Protection Clause of the United States Constitution. *Brigham v. State*, 166 Vt. 246, 265, 692 A.2d 384, 395 (1997). When no fundamental right or suspect class is involved, Article 7 requires that laws must be reasonably related to the promotion of a valid public purpose. *McCallum v. Seymour's Adm'r*, 165 Vt. 452, 457, 686 A.2d 935, 937-38 (1996). The Town's position is that the annual rental payments are so low that they do not serve a public purpose.

We agree that a lease of Town land without any benefit to the Town would not serve a public purpose. Thus, the Town must receive adequate and reasonable rent or other benefits. See, e.g., *City of Douglas v. Douglas Canning Co.*, 161 F. Supp. 379, 383-84 (D. Alaska 1958) (consideration received from lease of wharf may be reasonable if benefits of salmon cannery are included); *City of Tempe v. Pilot*

---

[2] Chapter I, Article 9 prohibits the raising of a tax unless it furthers a public purpose: "[P]revious to any law being made to raise a tax, the purpose for which it is to be raised ought to appear evident to the Legislature to be of more service to community than the money would be if not collected." Vt. Const. ch. I, art. 9; see also *Gross v. Gates*, 109 Vt. 156, 160, 194 A. 465, 467-68 (1937) (legislative act benefiting widow of slain police officer did not violate Article 9). In leasing municipally owned property, the Town is neither imposing a tax nor spending public funds. Thus, we do not believe plaintiffs' lease implicates this clause, and reject those aspects of the Town's argument that rely upon Article 9.

*Properties, Inc.*, 527 P.2d 515, 521-22 (Ariz. Ct. App. 1974) (benefits received by city from lease of sports stadium are more than amount of rent alone); *Ott v. Town of West New York*, 222 A.2d 541, 551 (N.J. Sup. Ct. 1966) (municipal agency properly determined that long-term benefits of middle-income housing outweighed immediate dollar return that might be gained from sale of land). There is, of course, no requirement that the Town receive fair market rental value for the lease. See *Dothan Area Chamber of Commerce, Inc. v. Shealy*, 561 So. 2d 515, 517 (Ala. 1990) (municipality not required to prove that it received fair market value on lease of property).

■ Two other points are crucial to our review. First, our standard of review is necessarily deferential. We will review municipal lease agreements only for abuse of discretion, and will not substitute our judgment for that of the municipal corporation, even if we would have insisted on a greater benefit to the Town had we negotiated the lease. See *Bates v. Bassett*, 60 Vt. 530, 535, 15 A. 200, 202 (1888) (Court will defer to municipal corporation "until it is seen that [its] discretion is abused by a willful perversion of [its lawful] power to illegal ends or abuse of its exercise that demands restriction"). This deferential standard of review has been adopted by a number of other jurisdictions that have considered the adequacy of lease payments received by municipalities. See, e.g., *Shealy*, 561 So. 2d at 517 (adequacy of consideration is left to judgment of city's duly elected officials); *Kromko v. Arizona Bd. of Regents*, 718 P.2d 478, 481 (Ariz. 1986) (consideration received by municipal corporation is reviewed for abuse of discretion).

■ Second, we believe that the adequacy of the rent must be evaluated from the perspective of the parties at the time the lease was made. Cf. *Lloyd's Credit Corp. v. Marlin Mgt. Servs., Inc.*, 158 Vt. 594, 598, 614 A.2d 812, 815 (1992). In any long-term lease, the passage of time is likely to make it more favorable to one of the parties. Thus, each party takes the risk that future events will disadvantage the party's economic position. We cannot allow a town to enforce a lease when it is economically productive and repudiate it when the assumed risks make it less productive. Cf. *Town of Mount Holly v. Buswell*, 45 Vt. 354, 361-62 (1873). Indeed, we note that long-term leases of public land, with fixed annual rents, were common in this state in early years. See, e.g., *Johnson v. Town of Salisbury*, 120 Vt. 6, 7, 132 A.2d 423, 424 (1957) (year-to-year tenancy with annual rent of twenty dollars); *Jones v. Vermont Asbestos Corp.*, 108 Vt. 79, 86, 182 A. 291,

294 (1936) (long-term leases with annual rents of $17.50 and $25); *University of Vt. v. Ward*, 104 Vt. 239, 246, 263, 158 A. 773, 778, 787 (1932) (long-term lease with reserved annual rent). Only when the rent payment was de minimis did we hold that a perpetual lease was actually a conveyance in fee simple. See *Society for the Propogation of the Gospel v. Town of Sharon*, 28 Vt. 603, 616 (1856); see also *Board of Educ. v. Hudson*, 585 So. 2d 683, 686-87 (Miss. 1991) (invalidating ninety-nine-year lease obtained for one-time fee of $150). We are necessarily reluctant to hold that the common practice of long-term, fixed-rent leases violates Article 7 if the financial terms become less advantageous to the town over time.

■ With these principles in mind, we conclude that the Town receives adequate and reasonable benefits from plaintiffs in connection with the lease. Specifically, the Town receives rental payments from the lease of the land, property taxes on improvements to the land, and the possibility of obtaining title to plaintiffs' house at the end of the lease. By leasing instead of selling, the Town also retains the ability to convert the property into a public use upon expiration of the lease.

We are not persuaded by the Town's argument that we should ignore the tax benefits the Town obtains from plaintiffs' house because these taxes represent an independent obligation of ownership of real property. Because the land is primarily developed for summer camps, the leases offer the Town the ability to increase its property tax base without incurring high expenses for public services to lessees.[3] This tax base with limited services helps keep property taxes down for year-round residents.

The Town's property base increases, however, only if lessees use the land for a home or seasonal camp. The attractiveness of this use is necessarily limited because, at the end of the rental period, the Town can reclaim the land and force the lessee to lose the structure or move it at great expense. In this case, the evidence suggests that the structure cannot be moved so the Town will obtain it at the end of the lease. The limited period of the lease, and the development expense desired by the Town and assumed by the lessee, may well

---

[3] We recognize that, pursuant to a formal lease amendment, plaintiffs are allowed to use the property for a year-round residence. This amendment does not change our conclusion. The leases normally limit the use to "a summer seasonal vacation dwelling." In waiving that limit with respect to plaintiffs, the Town presumably ensured that the cost of public services did not become excessive in relation to the benefit received.

have limited the rent that the Town could charge when the leases were negotiated. Even if we ignore the benefit to the Town of additions to the property base, we cannot conclude that the benefits to the Town were inadequate at the time the lease was signed. The fact that the Town is now able to negotiate more advantageous rental terms does not change our assessment of the situation in 1979.

We have reviewed the cases from other jurisdictions on which the Town has relied and find them distinguishable. Most are based on precise constitutional prohibitions that are not included in the Vermont Constitution. We need not analyze the differences in constitutional language, however, because in each case the return to the municipality was minimal and the inadequacy was present from the beginning of the lease. See *City of Tempe*, 527 P.2d at 521-22 (lease to baseball team of 110 acres at $1 per year for spring training facility could violate constitutional prohibition on "donation or grant, by subsidy or otherwise" if consideration received by city is so inequitable and unreasonable as to be abuse of discretion); *Northeast La. Detachment of Marine Corps League v. City of Monroe*, 253 So. 2d 107, 110 (La. Ct. App. 1971) (ninety-nine-year lease of 3.2 acres at $1 per year to nonprofit organization amounted to loan or grant of public property because consideration was not "serious or sufficient"); *Board of Educ.*, 585 So. 2d at 688 (ninety-nine-year lease of 3.5 acres for a one-time fee of $150 violated constitutional provision prohibiting donation of public lands to private individual or business); *City of East Orange v. Board of Water Comm'rs*, 191 A.2d 749, 752-56 (N.J. Super. Ct. App. Div.), *aff'd*, 194 A.2d 459, 461 (N.J. 1963) (lease of 151 acres for golf course was unconstitutional gift of public land where rent was $1 per year and the city agreed to pay first $1500 of property taxes). We hold that the lease terms in this case served a public purpose and were reasonably related to the promotion of that purpose. As a result, the Town may not avoid enforcement of the option to renew on the ground that it violates Chapter I, Article 7 of the Vermont Constitution.

■ As its second and third claims, the Town has repackaged its fairness arguments into claims that the lease violates public policy and is not supported by adequate consideration. Having concluded that the lease terms provide adequate and reasonable benefits, our constitutional analysis disposes of these two claims.

■ Finally, the Town contends that its selectmen lacked authority to enter into a lease for fifteen years with an option to renew because the Town voted at its 1891 annual meeting to limit leases on

Thompson's Point to fifteen years. The Town of Charlotte has an original land-grant charter dating back to 1762; it does not have a legislative charter. As a result, the Town's powers and functions derive from the general statutory scheme for municipalities. 24 V.S.A. §§ 801-5200. Towns have the power to hold and manage real property, see *Village of Hardwick v. Town of Wolcott*, 98 Vt. 343, 351, 129 A. 159, 161 (1925), and this power includes the authority to lease its real estate as necessary for public purposes, see *Davis v. Inhabitants of Rockport*, 100 N.E. 612, 614 (Mass. 1913).

The record indicates that the Town purchased Thompson's Point in 1839 in order to establish a "poor farm." See 1840 R.S. 17, § 1 (authorizing purchase of land by towns for purpose of establishing work-houses for poor). The statute governing poor farms authorized other uses of the property "when the town or towns interested determine[d] so to do." 1880 R.L. § 2872. In a similar manner, the statute governing glebe lands also allows for other uses; however, the glebe lands statute gives specific authority to the town selectmen rather than the town. See 24 V.S.A. §§ 2401-2405. Perhaps due to this difference in statutory language, the Thompson's Point leases became a matter of town vote. In 1882, the Town of Charlotte voted to lease lots on Thompson's Point at "fair and equitable rates." In 1891, the Town voted to limit leases on Thompson's Point to fifteen years. The Town has not rescinded or amended these votes. Poor farms were abolished by the Legislature in 1967. See 1967, No. 147, § 53. In 1978, the Legislature repealed — as unnecessary — the statute allowing towns to use poor farm property for other purposes. See 1977, No. 147 (Adj. Sess.). By 1979, when plaintiffs entered into their lease with the Town of Charlotte, the Legislature treated "poor farm" property like any other town property.

 The selectmen "have the general supervision of the affairs of the town." 24 V.S.A. § 872. This is a broad power "to undertake many administrative duties imposed and authorized by the statutory law concerning the safety, convenience and health of their townspeople." *Lawton v. Town of Brattleboro*, 128 Vt. 525, 529, 266 A.2d 816, 819 (1970). Although the Legislature can create exceptions to this broad authority, see *Kirchner v. Giebink*, 150 Vt. 172, 175, 552 A.2d 372, 374 (1988), it has imposed no limit that is applicable in this case. The selectmen's general supervisory power is derived from statute and not from any vote of the electorate. See *Lawton*, 128 Vt. at 529, 266 A.2d at 819.

The management of town government has grown increasingly complex over the years, and necessarily, the governance powers of selectmen have expanded. Much of this management cannot await the direction of citizens at annual or special town meetings. In *Kirchner*, the selectmen entered into a complicated contract with a private developer to expand the size of the town's sewage treatment plant and to construct over a mile of sewer line, with the developer paying for the cost of the improvements and the town agreeing to collect connection fees from other users and reimburse the developer for part of its costs. See *Kirchner*, 150 Vt. at 174-80, 552 A.2d at 374-78. In general, we found the agreement to be a valid exercise of the selectmen's supervisory powers. *Id.* We have also recently held that the release of a town's ownership interest in timber, cut from town land, was within the selectmen's supervisory authority. *Town of Wolcott v. Behrend*, 147 Vt. 453, 457, 519 A.2d 1156, 1159 (1986).

■ We have no difficulty holding that the lease of public land, under the circumstances present in this case, fell within the supervisory power of the selectmen. See 24 V.S.A. § 872. It would not be good management to have the voters attempt to negotiate the details of leases; nor would it be sound management to require the board to sit idle under these circumstances awaiting infrequent opportunities to obtain direction from the voters. Furthermore, because the selectmen were acting pursuant to their general supervisory powers when they entered into the 1979 lease with plaintiffs, they were not bound by the Town's vote in 1891 to limit leases to fifteen years.[4] The Town is now obligated to abide by the terms of plaintiffs' original lease. We therefore affirm the grant of summary judgment to plaintiffs.[5]

*Affirmed.*

---

[4] The federal court resolved the Town's argument that the 1891 vote controlled by holding that the Town had waived the claim by receiving the benefit of the leases without complaint for more than fifteen years. See *Rutter*, slip op. at 11. In view of our disposition, we do not reach the waiver issue. Nor do we decide whether the option to renew violated the term restriction imposed by the voters.

[5] By letter, the Town has asked that we consider the effect of the recently enacted "Act Relating to Educational Opportunity," which the Town claims will result in further significant reductions in its property tax rate in the future. The issue before us is whether the Town should have renewed the lease in 1994, and we have resolved that issue. We have not considered events that may have occurred thereafter and are outside the record.